[Civ. No. 42753. First Dist., Div. Four. Mar. 23, 1979.]

DENNIS SMITH, a Minor, etc., Plaintiff and Appellant, v.
ALAMEDA COUNTY SOCIAL SERVICES AGENCY et al.,
Defendants and Respondents.

932

## Counsel

Robert L. Walker and Abigail English for Plaintiff and Appellant.

Richard J. Moore, County Counsel, Crosby, Heafey, Roach & May, E. Melville McKinney, Peter W. Davis, Judith R. Epstein, St. Clair, Zappettini, McFetridge & Griffin, Bryan A. Marmesh and Joseph J. Kubancik for Defendants and Respondents.

## Opinion

**BRUNN, J.*—**In this case we undertake the delicate and difficult task of deciding whether or not to fashion a new cause of action. Appellant, in an able brief, states the underlying question: "The principal issue raised by this appeal is whether a county social services agency which has been entrusted with the sole responsibility for finding an infant an adoptive home may be held liable [for damages] if that agency negligently fails to carry out its responsibilities."

Our discussion will be in three parts. We will first summarize the factual and procedural setting. Next, we will examine the main question. Finally, we will direct our attention to several additional issues raised by appellant.

I

Dennis Smith (hereafter Dennis) appeals from a judgment of dismissal. The judgment was entered after the court below sustained demurrers to his complaint without leave to amend and also granted motions to strike the complaint.

*Assigned by the Chairperson of the Judicial Council.

The complaint names many defendants. They fall into two groups. One is the Alameda County Social Services Agency, related other public agencies and named employees of and consultants to them. For the sake of simplicity we will refer to this group as the agency. The other group not involved in the principal cause of action includes the Hayward Unified School District, the district's board of education and its superintendent of schools. We will refer to these defendants as the school district. The pertinent allegations of the complaint are summarized as follows:

When he filed his complaint Dennis was 17. Shortly after he was born, his mother relinquished him to the custody of the agency for the purpose of adoption. This was done pursuant to Civil Code section 224m, which sets up a procedure by which a "father or mother may relinquish a child to a licensed adoption agency for adoption."

The agency placed Dennis in a series of foster homes, but no one adopted him. The thrust of Dennis' first cause of action is that the agency negligently or intentionally failed to take reasonable actions to bring about Dennis' adoption. The agency left him with one set of foster parents for many years without asking them whether they wanted to adopt him. The agency knew or should have known that other foster parents with whom Dennis was placed never intended to adopt him. The agency did not attempt to find a proper preadoptive home for Dennis. As a direct consequence of the agency's failures he was never adopted, but spent his entire childhood in a series of foster and group homes. He was, therefore, deprived of a stable environment, parental nurturing, continuity of care and affection, a secure and homelike family environment, and proper and effective parental care and guidance. This caused Dennis damage, primarily mental and emotional suffering and grave interference with his psychological development.[1]

This is the heart of Dennis' first and main cause of action. The "facts" we have recited are, of course, only allegations. In accord with familiar principles we accept them as true for the purpose of testing their legal sufficiency. We state them as facts without repeatedly and boringly adding "alleged."

---

[1] There is also an allegation that he was repeatedly assaulted by an older foster child in one of the foster homes and suffered physical injury. This is pleaded as part of the claim based on the agency's asserted failure to take reasonable steps toward Dennis' adoption. We are not asked and do not decide whether such assaults might form an independent basis for a cause of action. (See *Elton* v. *County of Orange* (1970) 3 Cal.App.3d 1053 [84 Cal.Rptr. 27].)

We will discuss Dennis' other causes of action in part III of our opinion.

## II

It is easy in a case of this kind to fall into analytic confusion and to treat the question primarily as one whether there is or is not immunity under the California Tort Claims Act. (Gov. Code, § 810 et seq.) Under that act, the inquiry would be whether the conduct here alleged involved "basic policy decisions." (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 445 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166]; *Johnson* v. *State of California* (1968) 69 Cal.2d 782, 793 [73 Cal.Rptr. 240, 447 P.2d 352].)

Before the question of governmental immunity can arise, a more fundamental issue needs first to be faced: Is there any liability for damages under the circumstances before us, in the absence of governmental immunity? In other words, would a private adoption agency such as the Children's Home Society be liable under similar facts? Only if the answer is yes would the issue of immunity become important. (See Van Alstyne, Cal. Government Tort Liability (Cont.Ed.Bar 1964) p. 143.)

Decisions as to whether to tighten or enlarge "the circle of rights and remedies"[2] are often phrased in terms of a "duty of care." ▌ The existence or absence of a duty cannot be determined by mechanical or formal tests. Rather, "judicial recognition of such duty in the defendant, with the consequence of his liability in negligence for its breach, is initially to be dictated or precluded by considerations of public policy." (*Peter W.* v. *San Francisco Unified Sch. Dist.* (1976) 60 Cal.App.3d 814, 822 [131 Cal.Rptr. 854]; *Dillon* v. *Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]; *Raymond* v. *Paradise Unified School Dist.* (1963) 218 Cal.App.2d 1, 8-9 [31 Cal.Rptr. 847].) " '[D]uty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." (Prosser, Law of Torts (3d ed.) p. 333, quoted with approval in *Dillon* v. *Legg, supra.*) Invasion of a protected interest has replaced duty of care in the Restatement's delineation of the essentials for a negligence cause of action. (Rest.2d Torts, § 281; see also *Peter W., supra,* at p. 824.)

---

[2]Cardozo, *The Growth of the Law,* in Selected Writings of Benjamin Nathan Cardozo (1947) page 230.

Whether viewed from the perspective of duty of care or of protecting a particular interest, the nature of our inquiry is essentially the same as in *Peter W., supra.* The inquiry is not affected significantly by phrasing it in terms of recognizing a new set of rights and duties or in terms, used in *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], of departing from the basic principle of liability for negligence. No matter how the question is approached, the inquiry turns upon policy considerations.

■ In *Rowland* v. *Christian, supra,* the court stated the major factors to be considered: "[T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (69 Cal.2d at p. 113.)

■ Similarly, in *Raymond* v. *Paradise Unified School Dist., supra,* 218 Cal.App.2d at page 8, the court said: "The social utility of the activity out of which the injury arises, compared with the risks involved in its conduct; the kind of person with whom the actor is dealing; the workability of a rule of care, especially in terms of the parties' relative ability to adopt practical means of preventing injury; the relative ability of the parties to bear the financial burden of injury and the availability of means by which the loss may be shifted or spread; the body of statutes and judicial precedents which color the parties' relationship; the prophylactic effect of a rule of liability; in the case of a public agency defendant, the extent of its powers, the role imposed upon it by law and the limitations imposed upon it by budget; and finally, the moral imperatives which judges share with their fellow citizens—such are the factors which play a role in the determination of duty. [Citations.]"

■ When we apply the various considerations of policy we find that they militate strongly against liability in the situation before us:

A. As in *Peter W.* the duty sought to be imposed here does not present us with a reasonably clear or manageable standard for assessing the wrongfulness of the agency's conduct. A trier of fact would have to exercise hindsight over 17 years of social work involving difficult and at least partially subjective decisions about when and with whom to place a

preadoptive child. Dennis had two long-term placements with foster parents, neither of which resulted in his adoption. Until the fairly recent decline in the birth rate, the number of children accepted for adoption by social service agencies exceeded the number eventually placed. (tenBroek, *California's Adoption Law and Programs* (1955) 6 Hastings L.J. 261, 319.) More importantly, despite changes in the supply of and demand for children to adopt, the chances of a child being adopted by a foster family remain low; it is not uncommon for children who need adoptive homes to live in supposedly temporary foster homes for years and never be adopted. (Bodenheimer, *New Trends and Requirements in Adoption Law and Proposals for Legislative Change* (1975) 49 So.Cal.L.Rev. 10, 13, 35.) Whether an agency could or should have done something different with regard to the placement of any of the many children who received foster care but were not fortunate enough to be adopted would involve an inquiry of a highly speculative nature. To paraphrase what we said in *Peter W.*, unlike the activity of the highway or the marketplace, social work methodology provides no readily acceptable standards of care or cause.

B. If we examine the first three considerations listed by *Rowland*—foreseeability of harm, degree of certainty of injury and the closeness of the connection between the defendants' conduct and the injury—we are impelled toward the same conclusion. We may take it for granted that, other things being equal, adoption is a desirable goal and it is preferable to have a child reared by a single set of parents rather than by successive foster parents. But it does not follow that a foster child will probably or necessarily suffer greater emotional or developmental or other damage than an adopted one. This is especially so where a child receives competent and stable foster care.[3]

The type of injury complained of is necessarily the result of a host of causative factors other than the mere failure to a child to be adopted. A trier of fact would face inscrutable problems of trying to relate injury to violation of duty and in determining at what point or points in the long history in the relationship between appellant and the agency violations occurred. In short, harm is not easily foreseeable, let alone certain, nor closely connected to the assertedly wrongful conduct and damages cannot be ascertained with any reasonable degree of certainty. The reasons for denying liability here are even stronger than in cases such as *Borer* v. *American Airlines, Inc.* (1977) 19 Cal.3d 441 [138 Cal.Rptr. 302, 563 P.2d

---

[3]A claim of inadequate foster care would present different problems not embraced by this litigation. (See fn. 1, *ante.*)

858] and *Suter* v. *Leonard* (1975) 45 Cal.App.3d 744 [120 Cal.Rptr. 110], which held that minors may not sue for the loss of companionship, affection and guidance resulting from conduct of a defendant who negligently injured the minor's parent. There is less foreseeability of harm, less certainty of injury and a far more remote connection between the assertedly wrongful conduct and the injury in the situation before us than in *Borer* and *Suter.* Those cases declined to let minors recover for losses of consortium which, prior to the parents' injury, the minor had enjoyed; here the parental consortium never came into existence, although appellant did have, as we noted, the care, companionship and guidance of foster parents. "[N]ot every loss can be made compensable in money damages, and legal causation must terminate somewhere." (*Suter* v. *Leonard, supra,* 45 Cal.App.3d at p. 746.)

C. We doubt that the proposed liability would reduce future harm. If anything, it would be more likely to impede the proper functioning of adoption agencies. It is doubtful that the liability here involved can be insured against, let alone insured at reasonable cost. This factor, while not decisive, is worth noting in light of the budgetary restraints on public social service agencies, especially in the wake of the recently passed constitutional limitation on property taxes, Proposition 13. Finances aside, we do not believe that the placement process or the children, foster parents and social workers involved in it would be helped by trying to reconstruct events that necessarily are heavily tinged by considerations of judgment, discretion and a host of personal factors—events that occurred long ago and over an extended period of time—and by passing judgment on these events in a courtroom. In short, we view judicial intervention under these circumstances as neither useful nor workable.

D. We recognize that in our society individuals are increasingly affected in important and sometimes vital aspects of their lives by the actions of powerful institutions, both public and private. The accountability of institutions is, therefore, of considerable significance to the maintenance of a free society and nowhere more so than with respect to agencies that exercise control over persons, such as children, who are even less able to protect their own interests than normal adults.

Courts and legislatures have commendably applied the basic principle of accountability in a growing variety of situations, from sharply curtailing executive privilege to limiting governmental tort immunity to closer judicial scrutiny of administrative actions in mandamus proceedings to the treatment of adhesion contracts to a host of statutes and

decisions which expand consumer protection, to mention only a few. Recent cases have also established a trend of increased judicial attention to adoption agency decisions in writ proceedings. (See Bodenheimer, *supra*, at pp. 77-81; *Adoption of McDonald* (1954) 43 Cal.2d 447 [274 P.2d 860]; *Rodriguez* v. *Superior Court* (1971) 18 Cal.App.3d 510 [95 Cal.Rptr. 923]; *C. V. C.* v. *Superior Court* (1973) 29 Cal.App.3d 909 [106 Cal.Rptr. 123].) These cases have allowed interested parties to challenge the agency's decisions and provide safeguards against arbitrary actions that endanger the best interests of the child. Grievance machinery has been established for complaints about agency actions relating to adoptive home placement. (Cal. Admin. Code, tit. 22, § 30684.) Although state-provided legal representation of a minor in his own right is not yet available in civil proceedings, that, too, may change. (Compare, Bodenheimer, *supra*, at pp. 100-101.)

We believe that this trend is a healthy one. It indicates among other things that damage actions are not the only way toward greater institutional accountability and recognition of the individual needs. Here a damage action would be a particularly poor and unmanageable method for the reasons we have stated. The trend we have referred to may lead to the development of more practical and effective approaches which would genuinely benefit children who have been relinquished for adoption.

We conclude, therefore, that the first cause of action cannot be maintained.[4]

### III

We turn to the remaining causes of action.

A. Dennis' second cause of action pleads that the agency failed to carry out mandatory duties imposed on it by Welfare and Institutions Code sections 16115-16122 and title 22, California Administrative Code, section 30665 et seq. The asserted liability is grounded on Government Code section 815.6, which is part of the Tort Claims Act and which states: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately

---

[4] In his complaint appellant alleged both negligent and intentional conduct in the same cause of action. He has not suggested that different considerations would apply to the latter; indeed he contends here only that he has stated a cause of action based on negligence.

caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."

The Welfare and Institutions Code provisions involved require the State Department of Social Welfare to establish and administer a program to encourage the adoption of "hard-to-place" children.[5] Appellant is alleged to be such a child. The regulations which were adopted pursuant to the statute mandate licensed adoption agencies to implement the program by, among other things, publicizing the need for families for hard-to-place children, determining the eligibility of families for financial assistance and making agreements with prospective adoptive parents for such assistance. (Cal. Admin. Code, tit. 22, §§ 30665, 30669, 30671, 30672.)

We agree with appellant that these provisions evince a legislative intent to maximize the chances of adoption for hard-to-place children and that the regulations impose obligations on the respondent agency. However, as we noted in *Peter W.*, Government Code section 815.6, by its express terms, "imposes liability for failure to discharge only such 'mandatory duty' as is 'imposed by an enactment that is *designed to protect against the risk of a particular kind of injury.*'" (60 Cal.App.3d at p. 826; (italics added.) The statutory provisions before us cannot reasonably be construed as designed to "protect" hard-to-place children from the "injury" of not being adopted. Their purpose is to encourage and promote the adoption of as many such children as possible, but certainly not to impose on local agencies a mandatory duty to secure the adoption of each such child.[6] Society has a stake in furthering adoptions, but it does not follow that this interest is advanced by transmuting statutory provisions for adoption programs into springboards for damage actions.

---

[5] A "hard-to-place child" (the phrase is from the statute) is defined as "a child who is disadvantaged because of adverse parental background, or a handicapped child, or a child of the age of three years or more." (Welf. & Inst. Code, § 16116.)

[6] The Legislature took pains to spell out its intention in Welfare and Institutions Code section 16117:

"It is the purpose of this chapter to encourage and promote the placement in adoptive homes of children who because of their ethnic background, race, color, language, physical or mental, or emotional or medical handicaps, or age or because they are a sibling group who should be placed in the same home have become difficult to place in adoptive homes.

"It is the legislative intent to make available to prospective adoptive parents information concerning the availability of relinquished children, information and assistance in completing the adoption process, and the financial aid which might be required to enable them to adopt an otherwise hard-to-place child."

As we noted earlier, the concept of "injury" resulting from nonadoption presents grave problems and in view of the clear legislative language we cannot read into the statute an intent to protect against this "risk."

This case is a far cry from *Elton v. County of Orange, supra*, 3 Cal.App.3d 1053, on which appellant primarily relies. There the allegations were that the county agencies failed to enforce and comply with regulations governing the maintenance, care and supervision of dependent children, with the result that plaintiff was placed in a foster home where she was battered and beaten. The regulations involved in *Elton* were designed to protect the health and safety of dependent children and, thus, to prevent the very type of injury which was suffered. This, as we have seen, is not the case here. The present case is as different from *Elton* as *Peter W.* is from a case such as *Hoyem v. Manhattan Beach City Sch. Dist.* (1978) 22 Cal.3d 508 [150 Cal.Rptr. 1, 585 P.2d 851], where a student was injured because of the school's failure to use ordinary care in supervising him while he was on school premises.

Thus, the second cause of action is also insufficient to withstand demurrer.

■ B. The third cause fares no better. It seeks damages against the agency and its consulting clinical psychologist for negligently construing tests administered to Dennis as indicating mental retardation. The damage alleged is that appellant's foster parents and prospective adoptive parents were discouraged from adopting appellant when they were informed of the test results. As we said in part II of this opinion, any "injury" flowing from a failure to be adopted is too remote, uncertain and speculative to form the basis for recovery.

■ C. Appellant next seeks to set out a cause of action against the school district for negligently placing him in classes for the mentally retarded under circumstances where the district allegedly knew or should have known that he was not retarded.

Our decision in *Peter W., supra,* is completely dispositive of this issue. We held there that a cause of action seeking damages for educational malpractice was precluded by considerations of public policy, among them the difficulties of assessing the wrongs and injuries involved, the lack of a workable rule of care against which a school district's conduct may be measured and the incalculable burden which would be imposed on our public school systems. The duty which appellant seeks to impose here is essentially indistinguishable from the one argued for in *Peter W.* As the trial court noted: "In [*Peter W.*] it was alleged that the plaintiff did not receive an adequate education because he was not given proper remedial training; herein the plaintiff alleges that he did not receive an

adequate education because he was improperly given remedial training." In each case, the "duty of care" assertedly breached was that of providing appropriate educational training.

Appellant relies on several United States District Court decisions. They do not remotely support his position. *Pennsylvania Assn, Ret'd. Child.* v. *Commonwealth of PA* (E.D.Pa. 1972) 343 F.Supp. 279, and *Mills* v. *Board of Education of District of Columbia* (D.D.C. 1972) 348 F.Supp. 866, held that the total exclusion of retarded children from public education violated constitutional guarantees. *Hobson* v. *Hansen* (D.D.C. 1967) 269 F.Supp. 401, ruled that denying poor school children the education available to more affluent children was also constitutionally invalid. And *P.* v. *Riles* (N.D.Cal. 1972) 343 F.Supp. 1306, prohibited primary reliance on I.Q. tests, which the court found to be culturally biased, for the purpose of determining whether to place black students in special classes for the mentally retarded. We have no quarrel with the holdings of these cases. None contains the slightest implication that a school district may be held liable in money damages for negligently placing a student in mentally retarded classes.

D. In his fifth count appellant seeks punitive damages for the conduct complained of in the first four. Since we have held that none of the four states a cause of action, there is no basis for punitive damages. (*Kluge* v. *O'Gara* (1964) 227 Cal.App.2d 207, 209 [38 Cal.Rptr. 607]; *O'Neil* v. *Spillane* (1975) 45 Cal.App.3d 147, 161 [119 Cal.Rptr. 245].)

Our disposition of the tort causes of action makes it unnecessary to decide whether they, or any of them, are also barred by the immunity and claims of filing provisions of the California Tort Claims Act, Government Code section 810 et seq.

■ E. Appellant's last cause of action rests on a contract theory. He asserts that he is the express beneficiary of an agreement between his mother and the agency whereby his mother relinquished him to the agency and the agency promised that he would be adopted or that the agency would make reasonable efforts toward that end.

This count involves the same insuperable problems of damages as the principal negligence cause of action. The theory behind creating a remedy at law for breach of a contractual obligation is that the injured party should receive "as nearly as possible the equivalent of the benefits of performance." (1 Witkin, Summary of Cal. Law (8th ed. 1973)

Contracts, § 637, p. 541.) Accordingly, "[n]o damages can be recovered . . . which are not clearly ascertainable in both their nature and origin." (Civ. Code, § 3301.) While normally this is not an issue to be resolved at the pleading stage, the damages claimed here are identical to those sought on the negligence theory. With respect to the latter we said, in essence, that the injury and damages are highly uncertain in terms of their nature, cause and existence. This remains true whether the asserted breaches of obligation are labelled tortious or contractual. (See, e.g., *Automatic Poultry Feeder Co.* v. *Wedel* (1963) 213 Cal.App.2d 509, 516 [28 Cal.Rptr. 795].)

Accordingly, the judgment is affirmed.

Caldecott, P. J., and Rattigan, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 19, 1979. Newman, J., was of the opinion that the petition should be granted.