No. 81-72

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

---

B.M., a minor, by LEONA M.
BURGER, her guardian Ad Litem,

Plaintiff and Appellant,

vs.

STATE OF MONTANA, et al.,

Defendants and Respondents.

---

Appeal from: District Court of the Seventeenth Judicial District,
In and for the County of Valley
Honorable M. James Sorte, Judge presiding.

Counsel of Record:

For Appellant:

Russell A. Lavigne, Jr. argued, Helena, Montana

For Respondents:

Lucas, Jardine and Monaghan, Miles City, Montana
A. Lance Todd argued, Miles City, Montana
John A. Langen argued, Glasgow, Montana
Anderson, Symmes, Forbes, Peete & Brown, Billings, Montana
Richard Cebull argued, Billings, Montana
Robert Hurly, Glasgow, Montana
Gordon T. White, Glasgow, Montana

---

Submitted: September 23, 1981

Decided: July 14, 1982

Filed: JUL 14 1982

Thomas J. Kearney
Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

B.M., a minor, through her foster mother, appeals from summary judgment entered in Valley County District Court. The child's claim for damages arises from her placement in a special education program when she was six years old.

The child's complaint alleged that the State was negligent in placing her in such a program and that the alleged misplacement violated her constitutional rights of due process and equal protection. After extensive discovery, all parties moved for summary judgment. On November 18, 1980, the District Court granted summary judgment for all respondents "the State", ruling that they were immune from liability for claims arising from the states' "discretionary acts." The trial court also ruled that the State owes no legal duty of care to students negligently placed in special education programs. The trial court also held that such misplacement does not violate the constitutional rights of the student to due process and equal protection of the law.

The child's foster mother contends here that the trial court erred in ruling that the State was immune from negligence actions arising from the administration of special education programs in public schools. She further argues that the trial court erred in holding that the State owes no legal duty of care toward students who are negligently misplaced in special education programs. We reverse the trial court and hold that the State is not protected by immunity and that the State has a duty to use due care in placing students

-2-

in special education programs. The question of whether the State breached that duty of care and whether the breach was the cause of any injury raise material questions of fact for which a trial is necessary. We further hold, however, that the trial court properly dismissed the claims that the child's due process and equal protection rights were violated. No facts were alleged sufficient to allege a constitutional violation.

The child was born in 1967 and at nine months of age was placed in the foster home of Fred and Leona Burger. While in kindergarten in Nashua, Montana, she displayed learning difficulties, apparently the result of a speech problem. In January 1973, upon the recommendation of Superintendent of Schools Sam Gramlich, and with the consent of her foster father, the child was tested by psychologist William Jones of the Eastern Montana Regional Mental Health Center.

As a result of this testing, Jones recommended that the child either repeat her year in kindergarten or receive special educational help. The school officials decided that state funds would be sought for a special education program for first graders, including the child.

An application and plan were submitted to the office of the Superintendent of Public Instruction outlining the needs of the children for special help. On the application, the child was classified as "educable mentally retarded (EMR)." To be eligible under State policy for EMR status, absent sufficient written justification, a student must have an individual learning aptitude score of 50 to 75. (Special Education Handbook; Program Procedures and Guidelines for Children and Youth With Learning Handicaps, § III, B,

February 1973 (Handbook).) The child's overall IQ was determined to be 76.

The state superintendent approved the application and the program was started in September 1973. The program intended for this "primary educable class" was a "team-teaching situation." The four children in the program were to attend the regular first grade classroom, but their special education teacher was also to give them the special help and support needed "without segregating and labeling them." Of the four children in this program, only the child involved here was not mentally retarded.

The program involved two teachers. The regular first grade teacher and a special education teacher would both work with the students classified as EMR. This work would take place in the same classroom as the other students. But after five weeks, the child and the other three EMR students in the special program were found to be easily distracted and were moved to the "resource room" for their morning classes. This constituted approximately 40 percent of their daily classroom time, the rest of the day being spent as before. While in the resource room, the newly hired teacher taught the children with the same materials, but at a slower pace. The foster parents were not told of this change in the program.

The foster mother learned that the child was in the segregated classroom only after the child had been attending classes there for nine weeks. The foster mother immediately removed the child from the program and the school officials then abruptly terminated the program. It was during this nine week period that the foster mother claims she witnessed a dramatic worsening in the child's behavior. For example,

-4-

the child refused to dress herself and refused to eat
properly. The foster mother then filed suit as a result of
this alleged misplacement of the child in the segregated
classroom for the mentally retarded.

## SOVEREIGN IMMUNITY

The trial court held the State's acts were not subject
to judicial review because they were discretionary. The
Montana Constitution (Art. II, § 18), abolishes sovereign
immunity except in situations where the legislature, by a
two-thirds vote, enacts contrary legislation. Section 2-9-
102, MCA, enacted to give meaning to this constitutional
provision, provides:

> "Every governmental entity is subject to
> liability for its torts and those of its
> employees acting within the scope of their
> employment or duties whether arising out of
> a governmental or proprietory function except
> as specifically provided by the legislature. . ."

The legislature has not enacted legislation to limit
the liability of the school boards in the administration of
special education programs. It is, furthermore, our duty to
strictly construe any attempted governmental immunity--that
is, every act expanding statutory immunity, must be clearly
expressed. See Orser v. State (1978), 178 Mont. 126, 582
P.2d 1227; Noll v. City of Bozeman (1975), 166 Mont. 504,
534 P.2d 880.

Despite these clear constitutional and statutory provisions,
and the failure of the legislature to enact laws expanding
immunity to the situation involved here, the State argues
that public policy prohibits a holding that the State can be
held liable for negligent administration of a special education
program. Not only do we not see any public policy requirements
in support of such an argument, in the absence of a clear

-5-

statutory declaration granting immunity, it is our duty to permit rather than to deny an action for negligence.

## DUTY OF CARE

We have no difficulty in finding a duty of care owed to special education students. The general tenor of education for all citizens in Montana is stated in Art. X, § 1, 1972 Mont. Const.:

> "It is the goal of the people to establish a system of education which will develop the full educational potential of each person. Equality of educational opportunity is guaranteed to each person of the state."

To implement this policy, section 20-5-102, MCA, makes attendance at State approved schools mandatory. Other statutes specifically govern the administration of special education programs.

For example, section 20-7-402, MCA, provides that school districts "shall comply" with policies recommended by the State Superintendent of Public Instruction in administering special education programs. The Superintendent's office, under this statutory mandate has published a "Special Education Handbook" which outlines for individual school districts, the procedures and guidelines to be followed in administering special education programs.

In addition, section 20-7-401, MCA, sets up a special class of students for which special education programs are provided. The child clearly falls within this class. The complaint here is that the school district failed to follow the statutory and regulatory policies governing the placement of students in the special education program.

The school authorities owed the child a duty of reasonable care in testing her and placing her in an appropriate special education program. Whether that duty was breached

-6-

here, and assuming a breach, whether the child was injured by the breach of duty, are questions not before this Court. Nor were those issues placed before the trial court in the motion for summary judgment. We therefore reverse the trial court's order and remand for further proceedings.

## CONSTITUTIONAL CLAIMS

Without specifying how the child's due process rights were violated a right guaranteed by statute (section 20-7-402(1)(b), MCA), and more explicitly set forth in the Special Education Handbook, the complaint alleges a constitutional denial of due process. But the complaint alleges no constitutional claim which goes beyond the protection provided by the statute and the regulations. It was proper, therefore, for the trial court, to dismiss the due process claim based on a violation of the United States and Montana Constitutions.

The equal protection claim is also without merit. The sole basis for the equal protection violation is that William Jones, in evaluating the child's needs, considered the child's ethnic background (Indian) in relation to the child's learning difficulty. Jones stated that children who lived in non-English speaking homes may suffer what is known as bilingual language interference which is caused by the child's sudden exposure to an English-speaking environment. Jones also considered several other possible causes of the child's learning problems. This cannot be classified as invidious racial classification; nor can it be said that Jones had the purpose to discriminate on the basis of the child's race. A psychological evaluation which considers the cultural factors cannot be avoided if it is to have any validity. The evaluation cannot take place in a vacuum.

-7-

The equal protection claim, therefore, raises no material question of fact, and the trial court's dismissal was proper.

The order of the District Court is reversed in part, affirmed in part, and we remand for further proceedings.

_____
                          Justice

We Concur:


_____
              Chief Justice


_____


_____


_____
                Justices

Mr. Chief Justice Haswell concurring:

I concur in the result. In my view there are genuine issues of material fact precluding summary judgment, Rule 56(a), M.R.Civ.P.

There are genuine issues of material fact concerning whether the school authorities followed the statutes defining the student's eligibility for the special education program, whether the school authorities followed the statute requiring a free appropriate public education in the least restrictive environment and whether the nature and severity of the child's handicap was such that education in regular classes could not be achieved satisfactorily. These facts are germane in determining whether the child was afforded procedural due process in her placement and training.

There are also genuine issues of material fact relating to negligence of the defendants. The gist of the claim is negligent misclassification of the student as mentally retarded and subject to special education and negligent misplacement in a segregated classroom.

This is not a case of educational malpractice of the genre of W. v. San Francisco Unified School Dist. (1976), 60 Cal.App.3rd 814, 141 Cal.Rptr. 854, or Donahue v. Copiague Union Free School Dist. (1979), 418 N.Y. Supp.2d 375, 391 N.E.2d 1352, 1 ALR4th 1133, involving negligent failure to adequately educate a child in basic academic skills. No action lies for this type of claim for public policy reasons, and Annot, <u>Tort</u> <u>Liability</u> <u>of</u> <u>Public</u> <u>Schools</u> <u>and</u> <u>Institutions</u> <u>of</u> <u>Higher</u> <u>Learning</u> <u>for</u> <u>Educational</u> <u>Malpractice,</u> 1 ALR4th 1133 (1980). Here the claim involves violation of mandatory statutes alleged to constitute negligence and denial of procedural due process.

I agree with the majority's remarks regarding sovereign immunity. However, the statutes make it clear that the governmental employer will ultimately bear the burden of liability

for torts committed by its employees in the scope of their employment.

Section 2-9-103, MCA, provides in pertinent part:

> "Governmental entities liable for torts except as specifically provided by legislature. Every governmental entity is subject to liability for its torts and those of its employees acting within the scope of their employment or duties . . ." (Emphasis added.)

Section 2-9-305(4), MCA, provides in pertinent part:

> "(4)  In any action in which a governmental entity employee is a party defendant, the employee shall be indemnified by the governmental entity employer for any money judgments or legal expenses to which he may be subject as a result of the suit . . ."

Moreover, for a governmental employer to be held responsible there must be some direct, detailed or daily supervision over the employee, State v. District Court of the Thirteenth Judicial District (1976), 170 Mont. 15, 550 P.2d 382.  Here the primary defendants are the school authorities.  Plaintiff has joined a multitude of other defendants in her claim including the County of Valley and Jones, the psychologist at the Eastern Montana Regional Mental Health Center.  If subsequent discovery or evidence adduced at trial reveals that some of the defendants had no such close connection with the governmental employees, they should be dismissed from the suit on appropriate motions.

For the above reasons, I concur in the result.

_____
Chief Justice

- 10 -

Mr. Justice John C. Sheehy, dissenting:

We are faced here with a difficult public policy determination, whether courts should entertain claims based on these or similar facts. The District Court concluded that they should not, and I agree. The underlying public policy considerations are best evidenced by a review of two recent New York cases, Donahue v. Copiague Union Free School Dist. (1979), 391 N.E.2d 1352, 47 N.Y.2d 440; and Hoffman v. Board of Ed. of City of N.Y. (1979), 400 N.E.2d 317, 49 N.Y.2d 121.

Donahue involved a situation where a high school graduate sued a school district for alleged educational malpractice and negligent breach of a constitutional duty to educate. Plaintiff had received a high school diploma despite being unable to comprehend written English on a level sufficient to enable him to complete an application for employment. There, the Court of Appeals of New York held first, that the constitutional claim must fail because no duty was ever intended to flow from the applicable constitutional provision to individual pupils. As to the educational malpractice claim, the unanimous court held that, although a complaint might on the pleadings state a cause of action within traditional notions of tort law, it violates public policy for the courts to interfere with the judgment of those responsible for the implementation of educational policies. The court went on to state that "this is not to say that there may never be gross violations of defined public policy which the courts would be obliged to recognize and correct."

Hoffman involved a fact situation much more similar to the one at bar. A kindergarten student with a speech

defect was tested and determined to be mentally retarded. (IQ 74.) Accordingly, he was placed in a class for children with Retarded Mental Development (CRMD), where he remained for the next twelve years. The original testing psychologist, unsure of his findings because of the student's communicative problems, had recommended reevaluation within the first two years. Achievement tests, but no IQ tests, were administered regularly over those 12 years. In two of those years, Hoffman received a 90 percentile rating in reading readiness, but otherwise was considered to be making little progress.

At age 18, he transferred to an Occupational Training Center, where it was discovered that his IQ was actually 94. Since his training at the Center depended on his retarded status, Hoffman was forced to withdraw, and suit was brought against the Board of Education. The suit alleged negligence in the Board's original assessment, in their failure to retest, and in their subsequent misclassification.

In a 4 to 3 decision, with two of the dissenters having been in the majority in the Donahue case decided 6 months earlier, the Court reversed the lower court which had affirmed, as to liability, a $750,000 judgment for the plaintiff. The majority relied primarily on Donahue in stating that courts may not substitute their judgment "for the professional judgment of educators and government officials actually engaged in the complex and often delicate process of educating the many thousands of children in our schools." The court also decided that even under these circumstances, there were no "gross violations of public policy."

Similar reasoning is found in an earlier California case, Peter W. v. San Francisco Unified School District (1976), 60 Cal.App.3d 814, 131 Cap.Rptr. 854. The California

-12-

Court of Appeal was faced with a claim similar to that presented in Donahue. After a lengthy discussion of the duty of care involved, the court concluded: "To hold them to an actionable 'duty of care,' in the discharge of their academic functions, would expose them to the tort claims-- real or imagined--of disaffected students and parents in countless numbers. They are already beset by social and financial problems which have gone to major litigation, but for which no permanent solution has yet appeared. (Citing cases.) The ultimate consequences, in terms of public time and money, would burden them--the society--beyond calculation."

The same California court employed the same reasoning in disposing of a later case of alleged improper remedial training. In Smith v. Alameda Cty. Soc. Serv. Agency (1979), 90 Cal.App.3d 929, 153 Cal.Rptr. 712, one aspect of the plaintiff's complaint against the school district was his negligent placement in classes for the mentally retarded under circumstances where the district allegedly knew or should have known that he was not retarded. After citing and distinguishing several cases that are also cited by appellant here, the court stated:

> "None contains the slightest implication that a school district may be held liable in money damages for negligently placing a student in mentally retarded classes." 153 Cal.Rptr. at 719.

The most recent case our research has discovered is D.S.W. v. Fairbanks No. Star Bar. Sch. Dist. (Alaska 1981), 628 P.2d 554, wherein an action was brought to recover against a school district for negligent classification, placement, or teaching of students suffering from dyslexia. Citing Peter W., Donahue, Hoffman, and Smith with approval, the Alaska Supreme Court went on to state the following, and I agree:

-13-

"In particular we think that the remedy of
money damages is inappropriate as a remedy
for one who has been a victim of errors
made during his or her education.  The level
of success which might have been achieved had
the mistakes not been made will, we believe,
be necessarily incapable of assessment, rendering
legal cause an imponderable which is beyond the
ability of courts to deal with in a reasoned
way."  628 P.2d at 556.

Further, several United States Supreme Court cases have vitiated lower court decisions which found the unintended stigmatization from inaccurate assessment or placement to be an actionable constitution violation.  A plaintiff seeking to allege deprivation of his liberty interest without due process of law on account of a special placement program should be required to plead and prove an untrue, derogatory publication which seriously stigmatized him in the community, coupled with an expulsion or exclusion comparable to a discharge of an employee.  See Codd v. Velger (1977), 429 U.S. 624; Bishop v. Wood (1976), 426 U.S. 341; Paul v. Davis (1976), 424 U.S. 693; also 45 Missouri Law Review 667, 696 (1980).

I would affirm the District Court.

_____
Justice

I concur with the foregoing dissent.

_____
Justice

-14-

Mr. Justice Fred J. Weber, dissenting:

I concur in the foregoing dissent of Justice Sheehy. In view of the difference of opinion expressed by the members of this Court, and because of the potential for claims by disaffected students and parents in countless numbers, I suggest that the legislature properly may consider whether it desires to impose an appropriate limit in this type of litigation.

_____
Justice