**Linda L. MOORE; Royce Moore; and Linda L. Moore, as Mother and Next Friend of Tracy Moore, Appellants,**

v.

**Lance E. VANDERLOO; and Lance E. Vanderloo, D.C., d/b/a Vanderloo Chiropractic Health Center, Defendants,**

and

**Palmer College Foundation, a Corporation d/b/a Palmer College of Chiropractic, Inc., a Corporation; Ortho Pharmaceutical Corporation; and Ortho Pharmaceuticals, Inc., Appellees.**

No. 85–518.

Supreme Court of Iowa.

April 16, 1986.

Marion H. Pothoven and Jeanne K. Johnson, of Clements, Blomgren & Pothoven, Oskaloosa, and Charles F. Preuss, of Bronson, Bronson & McKinnon, San Francisco, Cal., for appellees Ortho.

James E. Shipman, Carolyn M. Hinz and Matthew J. Brandes, of Simmons, Perrine, Albright & Ellwood, Cedar Rapids, for appellants.

David L. Hammer and Les V. Reddick, of O'Connor & Thomas, P.C., Dubuque, for appellees Palmer.

Considered by REYNOLDSON, C.J., and UHLENHOPP, McGIVERIN, CARTER and LAVORATO, JJ.

McGIVERIN, Justice.

Plaintiff Linda Moore suffered a stroke after undergoing a chiropractic manipulation of her neck. She and her children later filed this suit against the chiropractor, Lance Vanderloo; the chiropractic college which Vanderloo had attended, Palmer College of Chiropractic (Palmer); and the manufacturer of Moore's oral contraceptive, Ortho Pharmaceutical Corp. and Ortho Pharmaceuticals, Inc. (Ortho). The claims against Vanderloo were settled before trial. Plaintiffs have appealed from a summary judgment which was granted in favor of Palmer and from the judgment entered upon the favorable jury verdict for Ortho. Upon consideration of the issues presented for our review, we affirm the district court's rulings as to both defendants.

In November 1978, plaintiff Linda Moore began receiving chiropractic treatments from Dr. Lance Vanderloo. Dr. Vanderloo had graduated and received a diploma four years previously from defendant Palmer College of Chiropractic. At this time, Moore was thirty-five years old and was taking an oral contraceptive manufactured by defendant Ortho. She had been taking oral contraceptives since 1963 and had been on some type of a birth control pill manufactured by Ortho since 1968. Moore regularly smoked one to one and one-half packs of cigarettes per day.

On November 20, 1978, Moore went to Vanderloo's office for a chiropractic treatment. After undergoing a cervical manipulation by Vanderloo, Moore experienced a sudden onset of a variety of symptoms. She was transported to the hospital, when her condition worsened, where it was determined that she was suffering a cerebral stroke. As a result of the stroke, plaintiff has permanent bodily and emotional impairment.

Moore and her sons subsequently brought actions for personal injuries and loss of consortium against Vanderloo, alleging breach of informed consent and negligence; against Palmer for breach of warranty and negligence for failing to properly research and teach Vanderloo the risk of stroke from chiropractic manipulation of the neck; and against Ortho in a strict liability in tort products action. These actions were consolidated, Iowa Rule of Civil Procedure 185, and the claims against Vanderloo were settled prior to trial.

■ Defendant Palmer filed a motion for summary judgment. Iowa R.Civ.P. 237. The district court, in sustaining the motion, regarded it as a motion to dismiss for failure to state a claim on which any relief can be granted, Iowa Rule of Civil Procedure 104(b), as to the negligence claim but did not specifically discuss the warranty claim. Accordingly, for purposes of this appeal, we also will regard defendant Palmer's motion for summary judgment as a rule 104(b) motion to dismiss as to the negligence claim but as a rule 237 motion for summary judgment as to the warranty claims.

The case proceeded to trial against the only remaining defendant, Ortho. During the trial, plaintiffs objected to the district court's exclusion of the testimony of one of their expert witnesses, the refusal to allow another of plaintiffs' experts to testify as a rebuttal witness, and the refusal to allow plaintiffs during closing arguments to comment on the failure of a particular defense witness to testify. Plaintiffs also objected to the court's instructions to the jury on the elements of proof required to establish a prima facie case of strict liability in tort. Finally, plaintiffs contend that they were entitled to a new trial or a corrective instruction to the jury by the court concerning alleged juror misconduct. These objections and contentions are the basis of plaintiffs' appeal as to Ortho.

Plaintiffs also appeal the court's ruling in favor of defendant Palmer.

We agree with the district court's dismissal of plaintiffs' claims against defendant Palmer and uphold the rulings challenged as to defendant Ortho. We conclude that the dismissal of plaintiffs' petition was proper as to defendant Palmer and that judgment was properly entered in favor of defendant Ortho on the favorable jury verdict.

I. *Claims against defendant Palmer.* Plaintiffs' action against defendant Palmer specifically raised the issues of whether certain express and implied warranties arose to the public from the granting of Palmer's diploma to Vanderloo, and from Palmer's dissemination of chiropractic advertising to the public. This part of the appeal also presents the question, which has not been previously addressed by this court, of whether an action can be successfully asserted by a third party against an educational institution for improperly teaching a student. The district court dismissed plaintiffs' petition as not stating a claim on which relief could be granted.

A. *Express warranty claims.* Plaintiffs claim that the diploma given to Dr. Vanderloo upon his graduation from Palmer constitutes an express warranty of his competence by Palmer to the public. They also argue that advertising material provided by Palmer expressly warranted the safety of the chiropractic method. In support of this theory, plaintiffs rely on provisions of the Uniform Commercial Code, Iowa Code chapter 554, and a general warranty argument. We believe this reliance is misplaced.

First, the Uniform Commercial Code does not apply to services; Article Two expressly governs transactions involving goods. *See Semler v. Knowling,* 325 N.W.2d 395, 398–99 (Iowa 1982) (contract predominantly for services not within the scope of Article Two of the U.C.C.). Even assuming that the Uniform Commercial Code may be applied here by analogy, Iowa Code section 554.2313(1)(a) (1977) provides that an express warranty is created by "[a]ny affirmation of fact or promise *made by the seller to the buyer* which relates to the

goods and *becomes part of the basis of the bargain* " (emphasis added). It would distort the privity concept articulated in section 554.2313(1)(a) to deem Palmer a "seller" and Moore a "buyer" of chiropractic services under our factual context.

Further, section 554.2313(1)(a) states that the express warranty must serve as part of the "basis of the bargain". There is no evidence under this record that Moore read or relied on any of Palmer's informational material. She testified she did not read any chiropractic literature at Dr. Vanderloo's office. Thus, such literature could not have caused her to seek chiropractic treatment from Dr. Vanderloo. As to Vanderloo's diploma, Moore did not know where he obtained his diploma, or that he even had one, and, thus, it did not serve as the basis of her decision to utilize Vanderloo's services. In fact, plaintiff testified in a deposition that she sought treatment from Dr. Vanderloo on the basis of a recommendation made to her by a previous chiropractor's nurse.

Second, if we assume *arguendo* that a general contractual warranty theory is applicable here, apart from the requirements of section 554.2313, serious problems regarding lack of consideration, privity and the nature of the contractual relationship arise. Moore testified by deposition that she did not read any chiropractic literature in Dr. Vanderloo's office nor did she know he attended Palmer. To create an express warranty in favor of a person who acted without reliance on representations would distort the express warranty theory. If we held there was a warranty created by a school upon issuance of a diploma or advertisements, absent reliance or privity, we would be opening the door to unlimited liability for all educational institutions, and any one of those that issues general informational literature to the public.

Finally, we note that a graduate of Palmer or any chiropractic school may not practice chiropractic in Iowa without a license. Iowa Code § 147.2. An applicant for a license must pass an examination in order to receive one, Iowa Code section 147.14(8),

and a license may be revoked for incompetency. Iowa Code § 147.55. Therefore, if any type of an express warranty is made regarding the competency of a chiropractor, it is given by the state, not Palmer.

For these reasons, we reject plaintiffs' theories against defendant Palmer regarding an express warranty.

■ B. *Implied warranty claims.* Plaintiffs also contend that Vanderloo's diploma and the advertising by Palmer created an implied warranty to the public. Although the previous discussion in subdivision I–A also would seem to apply to an implied warranty theory, we do not consider this claim made by plaintiffs. There was no argument made, nor authority cited, in plaintiffs' briefs regarding this issue; therefore, it is considered to be waived under our rules of appellate procedure. Iowa R.App.P. 14(a)(3).

■ C. *Educational malpractice claim.* Plaintiffs also assert that defendant Palmer should be held liable under a negligence theory for failure to teach Dr. Vanderloo, its student four years previously, certain risks created by manipulation techniques.

Both parties recognize this is a case of first impression in Iowa. Plaintiffs contend that educational malpractice is a viable and necessary theory. Defendant Palmer, on the other hand, offers strong policy reasons for refusing to recognize such an action. In connection with those policy reasons, we consider the cases in other jurisdictions which have faced this issue.

The courts in other jurisdictions have considered questions relating to the quality of education, and, in particular, whether tort liability exists on the part of a public school district for failure to adequately educate a student. These cases have arisen in a limited number of factual contexts and seem to fall into three general categories.

In one type of educational malpractice action, the plaintiffs, a student singly or with his or her parent(s), have argued that, in failing to adequately teach a student

basic academic skills, the public school district breached a duty owed to the student under common law, constitutional or statutory provisions, or that the public school district was liable for negligently or intentionally representing that a student was performing at or near grade level in basic academic skills. *See Peter W. v. San Francisco Unified School District,* 60 Cal. App.3d 814, 131 Cal.Rptr. 854 (1976); *Hunter v. Board of Education,* 292 Md. 481, 439 A.2d 582 (1982); *Donohue v. Copiague Union Free School District,* 47 N.Y.2d 440, 418 N.Y.S.2d 375, 391 N.E.2d 1352 (1979).

A second class of educational malpractice cases has arisen out of claims by a student who was either improperly placed in, or removed from, or negligently failed to be placed in, a special education program. *See Loughran v. Flanders,* 470 F.Supp. 110 (D.Conn.1979); *D.S.W. v. Fairbanks North Star Borough School District,* 628 P.2d 554 (Alaska 1981); *Smith v. Alameda County Social Services Agency,* 90 Cal. App.3d 929, 153 Cal.Rptr. 712 (1979); *Tubell v. Dade County Public Schools,* 419 So.2d 388 (Fla.Dist.Ct.App.1982); *Doe v. Board of Education,* 295 Md. 67, 453 A.2d 814 (1982); *B.M. v. State,* 649 P.2d 425 (Mont.1982); *Myers v. Medford Lakes Board of Education,* 199 N.J.Super. 511, 489 A.2d 1240 (1985); *Hoffman v. Board of Education,* 49 N.Y.2d 121, 424 N.Y.S.2d 376, 400 N.E.2d 317 (1979); *Helm v. Professional Children's School,* 103 Misc.2d 1053, 431 N.Y.S.2d 246 (N.Y.Sup.Ct.1980).

A final category of educational malpractice was raised in *Swidryk v. Saint Michael's Medical Center,* 201 N.J.Super. 601, 493 A.2d 641 (N.J.Super.Ct. Law Div. 1985). There plaintiff, in his first year of medical residency in obstetrics and gynecology, was named as a defendant in a malpractice action for his participation in the delivery of a child. The resident brought an action against the director of medical education at the hospital alleging that he was inadequately supervised and as a proximate result of this negligence, plaintiff was sued for malpractice.

With the exception of one case, *B.M. v. State*, 649 P.2d 425 (Mont.1982),[1] the courts in each of these three types of actions have unanimously failed to recognize a cause of action for educational malpractice. These decisions generally hold that such a cause of action seeking damages for acts of negligence in the educational process is precluded by considerations of public policy, among them being the absence of a workable standard of care against which the defendant educational institution's conduct may be measured, the inherent uncertainty in determining the cause and nature of any damages and the extra burden which would be imposed on the schools as well as the judiciary. *Hunter*, 292 Md. at 484–86, 439 A.2d at 584.

Although the factual context in the present case varies slightly from those educational malpractice cases previously cited, the public policy considerations raised in them also apply here and control our resolution of the issue of whether to recognize the tort of educational malpractice in Iowa as to a third party patient of a former student.

The first justification for not recognizing an educational malpractice cause of action is the lack of a satisfactory standard of care by which to measure an educator's conduct. As the California court in *Peter W.* stated:

> Unlike the activity of the highway or the marketplace, classroom methodology affords no readily acceptable standards of care, or cause, or injury. The science of pedagogy itself is fraught with different and conflicting theories of how or what a child should be taught, and any layman might—and commonly does—have his own emphatic views on the subject.

60 Cal.App.3d at 824, 131 Cal.Rptr. at 860–61.

We find this reasoning persuasive. What Palmer should have taught its students is a matter open to debate. Plaintiffs contend that the dangers of a certain manipulation should have been taught to Vanderloo. Whether plaintiffs are arguing that a reasonable chiropractic institution would have taught a student of the dangers or whether a special burden is to be placed on Palmer because of its pioneering efforts in the field of chiropractic is unclear. However, we are not prepared to determine what Palmer or any reasonable chiropractic institution should or would have taught to its students.

The second reason for refusing to recognize a claim of educational malpractice is the inherent uncertainty in determining the cause and nature of any damages. *Hunter*, 292 Md. at 487–88, 439 A.2d at 585. This reason is particularly persuasive in the present case involving a third party claim against an institution for what it allegedly did *not* teach a student, four years after that student graduated. We agree with the New York Court of Appeals' observation that although it may assume too much to conclude that proximate causation could *never* be established, that "this element might indeed be difficult, if not impossible to prove." *Donohue*, 47 N.Y.2d at 443, 418 N.Y.S.2d at 377, 391 N.E.2d at 1353–54.

A third justification offered for failure to recognize an educational malpractice cause of action is the resulting burden that would be placed on schools in what reasonably may be predicted to be an ensuing flood of litigation. *Hunter*, 292 Md. at 485–86, 439 A.2d at 584. This is a compelling policy reason in defendant Palmer's favor. As Palmer correctly notes, if a cause of action

---

**1.** In this case, a minor child and her guardian sued the state and school authorities for negligently misplacing her in a special education program. The court reversed a grant of summary judgment in favor of defendants state and school authorities and held there was a duty to use reasonable care in testing and placing a child in a special education program. The contrary case law from other jurisdictions was not recognized or distinguished in the majority opinion.

The case again came before the Montana Supreme Court in *B.M. v. State*, 698 P.2d 399 (Mont.1985). The court held that where there were admissions by the minor and her guardian that no real injury had been suffered, the minor could not recover damages allegedly arising from her misplacement.

for educational malpractice is recognized in Iowa, any malpractice case would have a malpractice action within it. For example, a doctor or attorney sued for malpractice by a patient or client might have an action over against his or her educational institution for failure to teach the doctor or attorney how to treat or handle the patient or client's problem. This would deplete a great amount of resources, both in terms of time and money spent by an institution, on litigation. Further, if an educational malpractice claim is allowed against a professional school, could we logically refuse to recognize such a cause of action against an institution offering training courses for certain trades? For example, would a homeowner damaged by faulty wiring have a cause of action against the electrician's trade school?

A fourth reason related by the courts in denying educational malpractice claims that is applicable here is that recognizing such a cause of action would force the courts blatantly to interfere with the internal operations and daily workings of an educational institution. *Donohue*, 47 N.Y.2d at 445, 418 N.Y.S.2d at 378, 391 N.E.2d at 1354. This concern is particularly appropriate in the area of higher education. As the Supreme Court stated in *Regents of the University of Michigan v. Ewing*, 474 U.S. ——, ——, 106 S.Ct. 507, 513, 88 L.Ed.2d 523, 532 (1985):

> When judges are asked to review the substance of a genuinely academic decision ... they should show great respect for the faculty's professional judgment. (Footnote omitted.)

It has been recognized that academic freedom thrives on the autonomous decision-making by the academy itself. *See Regents of the University of California v. Bakke*, 438 U.S. 265, 312, 98 S.Ct. 2733, 2759-60, 57 L.Ed.2d 750, 785 (1978). In essence, plaintiffs are asking this court to pass judgment on the curriculum of Palmer. We decline to do so.

Finally, we refuse to interfere with legislatively defined standards of competency. *See Swidryk*, 493 A.2d at 644-45. As we noted in division I-A above, the legislature requires a license in order to engage in the practice of chiropractic in Iowa. Iowa Code § 147.2. The examining board of chiropractic, Iowa Code section 147.14(8), administers examinations which must be passed in order for an applicant to receive a license. Licenses may be revoked for incompetency. Iowa Code § 147.55. Thus, the issue of competency is closely related to the licensing scheme contained in Iowa Code chapter 147 and controlled by the State of Iowa.

For these reasons, we conclude the district court correctly dismissed plaintiffs' petition against defendant Palmer.

II. *Claims against defendant Ortho.* Plaintiffs contend that the district court improperly entered a judgment for defendant Ortho based on the favorable jury verdict. Their objections relate to the exclusion of the testimony of certain expert witnesses, a jury instruction, final argument to the jury and alleged juror misconduct. We will consider each claim separately.

A. *Exclusion of testimony of Dr. Jahn.* Plaintiffs assert that the district court erred by excluding testimony of one of plaintiffs' expert witnesses, Dr. Warren Jahn, a chiropractor. The court excluded Dr. Jahn's testimony on the ground he was incompetent to testify as to the oral contraceptive's effect on the blood. Plaintiff made an offer of proof. We conclude the exclusion ruling was correct and that it was not an abuse of discretion to refuse to allow the proffered testimony of Dr. Jahn. *See State v. Myers*, 382 N.W.2d 91, 93 (Iowa 1986). However, we base this conclusion on reasons stated in other objections made by defendant Ortho, but not relied upon by the district court.

In plaintiffs' offer of proof, it was stated that Dr. Jahn would testify regarding Ortho's duty to warn chiropractors of the risks of a patient taking the birth control pill and then receiving chiropractic manipulations. He would have testified that the warning labels on the oral contraceptive container were inadequate to notify a chiro-

practor whether or not to avoid manipulative therapy.

However, Dr. Jahn also would have testified that chiropractic literature pertaining to the interrelationship between neck manipulations and taking the birth control pill, and the predisposition to stroke risk factor was published initially and became publicly known in late 1980 and early 1981. Moore's injury occurred in 1978, and, thus, such literature was not then available.

In *West v. Broderick & Bascom Rope Co.*, 197 N.W.2d 202, 209 (Iowa 1972), we stated that a manufacturer is liable for failure to warn when it knows or has reason to know that the product is likely to be dangerous for the use for which it is manufactured. The adequacy of a warning, however, must be judged in light of what was generally known at the time plaintiff was taking the oral contraceptives and received the manipulation in question from Dr. Vanderloo. *Woodill v. Parke Davis & Co.*, 58 Ill.App.3d 349, 15 Ill.Dec. 900, 374 N.E.2d 683, 686–87 (1978), *aff'd*, 79 Ill.2d 26, 37 Ill.Dec. 304, 402 N.E.2d 194 (1980). We conclude, therefore, that the manufacturer Ortho had no duty to warn when it did not know or should not have known of the danger. The contention that plaintiffs urge would impose a duty on a manufacturer to warn of unknown dangers, and we do not adopt such a requirement. Thus, the testimony of Dr. Jahn was immaterial, and the district court properly excluded it, regardless of whether or not Dr. Jahn was competent to testify to the proffered evidence.

■ B. *Exclusion of testimony of Dr. Davis.* Plaintiffs next urge us to reverse because they were not allowed to call Dr. William Davis as a rebuttal witness at trial. They contended that one of defendant's witnesses, Dr. Marengo-Rowe, changed his testimony at trial from that given in a pretrial deposition. The stated purpose of calling Dr. Davis was to rebut the testimony of Dr. Marengo-Rowe.

However, plaintiffs first notified defendant Ortho that they wished to call Dr. Davis as a rebuttal witness at the close of their case in chief, before defendant had presented any evidence. As defendant suggests, the timing of this request indicates that Dr. Davis was not a rebuttal witness, but a witness to be used to strengthen plaintiffs' case in chief.

Plaintiffs did not disclose Dr. Davis as an expert witness to the opposing parties as required by a pretrial court order. Due to the timing of the request to use his testimony and because we agree with the district court that defendant's expert, Dr. Marengo-Rowe, did not significantly change his trial testimony from that given in a pretrial deposition, we conclude that the district court acted within its discretion in refusing to allow the proposed evidence as rebuttal testimony. *See Wong v. Waterloo Community School District*, 232 N.W.2d 865, 869 (Iowa 1975).

■ C. *Closing argument objection.* Plaintiffs contend that the district court erred in refusing to allow comment during plaintiffs' closing argument on the absence of a defense witness that defendant's counsel mentioned in opening statement. Plaintiffs point out defendant's reference to the expected testimony of Dr. Jean-Paul Spire, regarding the presence of a congenital defect in an artery that might have contributed to Moore's stroke, during opening statements. Dr. Spire never was called to testify in the case. In closing argument, plaintiffs attempted to call the jury's attention to the fact that Dr. Spire never testified. Defendant Ortho objected, and the court sustained that objection. Defendant contends that the question of whether there was a congenital defect in Moore's artery that may have precipitated the stroke never became a medical issue during trial; and, thus, it was unnecessary to call Dr. Spire.

The district court has broad discretion in passing on propriety of jury arguments, and we will not reverse unless a clear abuse of discretion is shown. *Rasmussen v. Thilges*, 174 N.W.2d 384, 391 (Iowa 1970). Before a new trial will be granted

for misconduct in argument, it must appear that prejudice resulted or a different result would have been probable, but for the misconduct. *Kester v. Bruns,* 326 N.W.2d 279, 281 (Iowa 1982). There was no such showing made by plaintiffs here. It appears that the testimony of Dr. Spire related to something that never became an issue at trial. Therefore, defendant decided not to call him as an expert witness. The district court's ruling has not been shown to be an abuse of discretion.

**D.** *Jury instruction number eight.* Plaintiffs object to one of the jury instructions given by the court which marshalled the essential elements of the strict liability in tort products action. They contend that jury instruction number eight placed an added burden on them in the case. That jury instruction provided that plaintiffs must establish by a preponderance of the evidence that:

1. Ortho sold Ortho-Novum 1/80 [the contraceptive] and was engaged in the business of selling oral contraceptives, which has been stipulated as true;

2. lack of adequate warnings made Ortho-Novum 1/80 defective;

3. this defect made the product unreasonably dangerous;

4. lack of adequate warning was a proximate cause of Moore's ingestion of the drug;

5. Moore used Ortho-Novum 1/80 in the intended manner or manner reasonably foreseeable by Ortho;

6. the lack of warning defect existed at the time of the sale;

7. the ingestion of the drug was a proximate cause of Moore's injury.

Plaintiffs argue that paragraph four of instruction eight which required Moore to prove that the lack of an adequate warning was a proximate cause of her ingestion of the drug was incorrect. We conclude that plaintiffs were not prejudiced by the instruction and, thus, no reversible error occurred.

A drug manufacturer may be held liable for a defective product in a strict liability action. However, in recognition of the fact that certain prescription drugs, such as birth control pills, may cause side effects despite the fact they have been properly manufactured, these drugs are deemed "unavoidably unsafe products." *See* Restatement (Second) of Torts § 402A, Comment k (1965). These products are not held to be defective or unreasonably dangerous "so long as they are accompanied by proper directions for use and adequate warnings as to potential side effects." *Lindsay v. Ortho Pharmaceutical Corp.,* 637 F.2d 87, 90 (2d Cir.1980).

It is undisputed that plaintiffs had the burden of proving that the ingestion of the oral contraceptive was a proximate cause of plaintiff Linda Moore's injury. Plaintiffs also had to show that the lack of adequate warning concerning the pill was the proximate cause of plaintiff Linda Moore's injury. *See generally Osborn v. Massey-Ferguson, Inc.,* 290 N.W.2d 893, 901 (Iowa 1980) (essential elements of a strict liability in tort products action listed).

Therefore, paragraph four of instruction eight was merely a step in plaintiff's admitted burden of proving that a defect (lack of adequate warning) in or concerning the ingested drug was a proximate cause of plaintiff Moore's injury. Plaintiff had to take or ingest the pill before it could cause injury; therefore, no prejudice inhered to plaintiffs as a result of instruction eight which bifurcated the consideration of the proximate cause issue in the same marshalling instruction.

**E.** *Juror misconduct.* During the trial it came to the court's attention that a juror had read an article in the newspaper relating to the pending litigation. In the article, it was stated that Moore had settled out of court with Dr. Vanderloo for an undisclosed amount and that Palmer had been dismissed from the suit. A court attendant reported to the

court that one juror had mentioned the article to him.

Plaintiff moved for a mistrial which was overruled. The court then gave the jury a cautionary instruction to disregard publicity concerning the case and to decide it solely on the evidence presented in court.

A ground in plaintiff's motion for new trial was based on this incident. The district court has considerable discretion in determining whether to grant or refuse a new trial based on jury misconduct. *Pease v. Zazza,* 295 N.W.2d 43, 49 (Iowa 1980). "In order to justify a new trial on the basis of misconduct of jurors it must appear the misconduct was calculated to, and it is reasonably probable it did, influence the verdict." *In re Estate of Cory,* 169 N.W.2d 837, 845 (Iowa 1969).

This contention is similar to the misconduct alleged in *Harris v. Deere & Co.,* 263 N.W.2d 727 (Iowa 1978). There we held that it was not an abuse of discretion for the district court to refuse to grant a new trial because of alleged jury misconduct in discussing during deliberations plaintiffs' settlement with an employer at trial for $20,000. *Id.* at 729. Although the settlement in *Harris* occurred during trial and the jury was informed by the court of that fact, and here plaintiffs did not want the jury to know of the settlement with Vanderloo, this distinction does not alter the result. The newspaper article here did not disclose the amount of the settlement, a prejudicial factor, as was done in *Harris.* Thus, we adhere to our holding in *Harris* and conclude that plaintiffs are not entitled to a new trial against defendant Ortho because of claimed jury misconduct.

III. *Disposition.* After a consideration of all contentions made by plaintiff even though not discussed above, we conclude that the district court properly dismissed plaintiffs' claims against defendant Palmer and that judgment was properly entered on the favorable jury verdict for defendant Ortho.

AFFIRMED.