

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-5-2005

# Manning v. Temple Univ

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-1215

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Manning v. Temple Univ" (2005). *2005 Decisions.* Paper 165.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/165

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-1215
_____

VALERIE MANNING,

Appellant,

v.

TEMPLE UNIVERSITY;
TEMPLE UNIVERSITY SCHOOL OF MEDICINE;
RICHARD J. KOZERA, M.D.;
GERALD H. STERLING, PH.D;
JAMES P. RYAN, PH.D;
THOMAS MARINO, PH.D;
HELEN PEARSON, PH.D;
JOHN DOE NOS. 1-25,

Appellees.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 03-cv-04012)
District Court Judge: The Honorable Harvey Bartle III
_____

Argued: November 14, 2005

BEFORE: ROTH, FUENTES, and BECKER, Circuit Judges

(Filed: December 5, 2005)

1

Richard J. Silverberg (ARGUED)
Richard J. Silverberg & Associates, P.C.
1500 Walnut Street, Suite 1500
Philadelphia, PA 19102

ATTORNEY FOR APPELLANT

Matthew W. Strickler (ARGUED)
3420 North Broad Street
Room 107
Philadelphia, PA 19140

 Lance David Lewis
101 North Easton Road, Suite 202
Glenside, PA 19038

ATTORNEYS FOR APPELLEES

---

OPINION OF THE COURT

---

FUENTES, Circuit Judge.

Valerie Manning entered Temple University School of Medicine in 1999. After failing two courses in her first semester, she took a leave of absence and was placed on academic probation, requiring her to repeat her first year. When she returned in September 2000, Manning failed two courses in the first semester of her repeat year and two additional courses in the second semester. In July 2001, Manning was dismissed from Temple. She filed a complaint against Temple University, Temple University School of Medicine, and several professors and physicians at the medical school alleging that her

2

dismissal was motivated by race discrimination in violation of 42 U.S.C. § 1983, 42 U.S.C. § 1981, Title VI of the Civil Rights Act, the Pennsylvania Human Relations Act (PHRA), and the Pennsylvania Fair Educational Opportunities Act (PFEOA). Manning also asserts substantive and procedural due process violations under the United States Constitution, and several state common law claims. We conclude that defendant/appellees are entitled to judgment as a matter of law on all claims, and therefore affirm the decision of the District Court.[1]

## BACKGROUND

Manning entered Temple in September 1999, and although she apparently undertook a stringent study regime, she failed Gross Anatomy and Neuroanatomy in her first semester.[2] Claiming illness and problems with her student loans, Manning took a leave of absence at the end of her first semester. At that time, she received a letter from Temple stating that upon her return she would be placed on academic probation and would be required to repeat her first year. Manning failed Histology and Embryology in the first semester of her repeat year, and Biochemistry and Physiology in the second

---

[1] Manning appeals the District Court's grant of summary judgment as to her common law claims of breach of contract, breach of fiduciary duty, fraud, and intentional infliction of emotional distress. We conclude that the District Court analyzed these claims properly, see Manning v. Temple University, No. 03-4012, 2004 WL 3019230 at *9-12 (E.D.Pa. Dec. 30, 2004), and we need not discuss them in further detail here.

[2] Under the summary judgment standard, we present the facts in the light most favorable to Manning. Reichley v. Penn. Dep't of Agric., 427 F.3d 236, 244 (3d Cir. 2005).

semester.

Manning claims that her professors were generally inaccessible outside of class. In January 2001, she met with Dr. Helen Pearson, one of her professors, to discuss her study habits. Dr. Pearson suggested that Manning study from her notes rather than from index cards. Manning found that this advice was very helpful and led to an improvement in her performance in Dr. Pearson's course. Dr. Pearson also advised Manning to visit Temple's Recruitment, Admission, and Retention Office (RAR) for extra help. RAR is a federally-funded program that actively recruits minority students to Temple and offers student support services, including a seven-week summer program that provides a preview of the first year. Before the beginning of classes, students considered to be socioeconomically disadvantaged are invited to take advantage of RAR and the seven-week program. All African-American students receive an invitation, regardless of their academic qualifications or background. Students not considered to be disadvantaged are not specifically invited to join, although any student at Temple is permitted to participate in RAR activities. Manning did not believe that RAR could help her, and was upset that Dr. Pearson suggested that she try the program.

Manning also met with Dr. James P. Burke and Dr. James P. Ryan. Dr. Burke suggested that Manning study from old exams, and stated that he was surprised that Dr. Pearson had not offered the same advice. Dr. Ryan agreed that Manning should study from old exams. In May 2001, Manning spoke with a Caucasian student one year ahead

4

of her at Temple, known to her only as "Tracy." Tracy told Manning that Dr. Pearson had advised her to study from past exams. Manning was upset to learn that Dr. Pearson had provided this advice to Tracy but not to her.

In June 2001, Dr. Ryan told Manning that she would have to appear before the Student Promotions Committee (the "Committee"), which would determine whether she would advance to the next year or be dismissed. Dr. Ryan chaired the Committee, and requested that Manning meet with him to discuss the Committee's proceedings. Manning states that at this meeting, Dr. Ryan told her that she would not be dismissed and would simply have to retake some of her exams. Manning also states that Dr. Ryan discouraged her from appearing before the Committee with an advocate, and offered to advocate on her behalf. That same month, Manning received a letter from Dr. Gerald H. Sterling, the Assistant Dean for Medical Education, stating that she was being considered for dismissal according to Temple policy because she had received several failing grades while on probation. Manning submitted a letter stating that her performance was due to poor study methods, and that she had recently discovered better study methods.

In July 2001, Manning appeared alone before the eight-person Committee that included Drs. Pearson, Ryan, and Sterling. The meeting lasted about ten minutes and Manning was permitted to present her position. She was then asked to leave the room, and the committee members voted unanimously to dismiss her. That same day, Manning received a letter from Dr. Sterling explaining that, as stated in the Student and Faculty

5

Advisor Handbook, a student could appeal a Committee decision to the Dean "for cause, i.e., procedural irregularity." The letter did not mention an alternative procedure described in the Handbook, which allows a student who has received a failing grade while on probation to appeal based on "extenuating circumstances," defined as "severe and documented situations which were beyond the student's control and which prevented the student from performing in a manner truly reflective of his/her knowledge and skills."

Manning told Dr. Ryan that she intended to appeal to Dean Richard J. Kozera, and asked Dr. Ryan to write a letter of support. Manning says that Dr. Ryan agreed to do so. Manning picked up the sealed letter that same day, and e-mailed Dr. Ryan to request a copy for her records. When she did not receive a response over the weekend, she opened the letter. In the letter, Dr. Ryan stated that the vote against Manning had been unanimous, that Manning was "inefficient in her approach to learning," and that despite helpful advice on her study habits, "her final exam performance showed little improvement." He acknowledged that he told Manning that he would present her view to the committee and serve as her advocate. He also stated that he had told Manning that a letter of support to the Dean would not be appropriate, but that he "would explain [his] actions leading up to [the meeting before the SPC]."

Manning did not submit Dr. Ryan's letter, and instead procured a letter of support from Dr. Burke. In her own letter to the Dean, she blamed poor study methods for her failing grades. Manning and Dean Kozera met a few days later. Although Manning had

6

not transmitted Dr. Ryan's letter, Dean Kozera had read it. Dean Kozera sent her a letter soon after the meeting, stating that he had decided to uphold the Committee's decision and dismiss her from Temple.

## STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. <u>Blair v. Scott Specialty Gases</u>, 283 F.3d 595, 602-03 (3d Cir. 2002). Summary judgment is appropriate if, taking the facts in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## DISCUSSION

### I

Racial discrimination claims under the statutes asserted by Manning are considered under the framework established by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>See</u> <u>Jones v. Sch. Dist. of Philadelphia</u>, 198 F.3d 403, 410 (3d Cir. 1999) (applying <u>McDonnell Douglas</u> framework to 42 U.S.C. § 1981 and PHRA claims); <u>McKenna v. Pac. Rail Serv.</u>, 32 F.3d 820, 825 & n.3 (3d Cir. 1994) (noting that <u>McDonnell Douglas</u> framework applies to 42 U.S.C. §§ 1983 and 1981 claims); <u>Freeman v. Fahey</u>, 374 F.3d 663, 666 (8th Cir. 2004) (applying <u>McDonnell Douglas</u> framework to

Title VI claim).[3]

Under McDonnell Douglas, a plaintiff may establish a prima facie case of employment discrimination in hiring by showing "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." 411 U.S. at 802. This test has been tailored to apply to discrimination claims in various other contexts. See, e.g., Anderson v. Consol. Rail Corp., 297 F.3d 242, 249 (3d Cir. 2002) (applying a modified version of the McDonnell Douglas test to an age discrimination claim based on a reduction in force by an employer).

This Court has not adapted the McDonnell Douglas prima facie test to the education discrimination context. We need not do so here, because under any rendering of the test, Manning fails to raise the required inference of discrimination as to her dismissal from Temple. See, e.g., Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004) ("Although the *prima facie* elements of a discrimination claim vary depending on the particular facts of the case, the plaintiff must generally present evidence that 'raises an inference of discrimination.'") (citations omitted); Pivirotto v. Innovative Sys., Inc., 191

_____

[3] Although the McDonnell Douglas analysis has not been applied to a claim under the PFOEA, neither party disputes that McDonnell Douglas provides the appropriate test under that statute.

F.3d 344, 352, 355 (3d Cir. 1999) (noting that the McDonnell Douglas prima facie test "was never intended to be rigid, mechanized, or ritualistic," but that it "'requires evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion . . . .'") (quoting O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312 (1996)) (internal citation omitted).

Here, Manning relies almost exclusively on the RAR program to establish a prima facie case of discrimination, arguing that the program stereotyped her. She asserts that because the RAR program invites all African-American students to join regardless of their academic background, it suggests that "African-Americans/RAR students . . . lack the qualifications or capabilities to meet the demands of the medical school program." She provides no link, however, between this stereotyping and the adverse action she has claimed – her dismissal from Temple. Although Manning argues that "[Temple] determines that once an RAR student falters academically it is more cost-effective to simply let them fail than devote the resources to educate them," she points to no evidence to support this assertion. Without such evidence, she fails to raise an inference of discrimination. See Bibby v. Philadelphia Coca Cola Bottling Co., 260 F.3d 257, 264 (3d Cir. 2001) (noting in the gender discrimination context that "'[w]hatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue . . . actually constituted discrimina[tion].'") (citation omitted).

Relatedly, Manning suggests that she was stereotyped by the RAR program

9

because professors at Temple referred her to RAR rather than helping her with her coursework. Manning's only evidence to support this claim is that when she came to Dr. Pearson for help, Dr. Pearson referred her to the RAR program. Given that RAR is an established study assistance program at Temple, Dr. Pearson's suggestion that Manning try RAR does not in itself imply that Dr. Pearson was unwilling to help Manning with her coursework. Notably, in addition to her suggestion that Manning try RAR, Dr. Pearson gave Manning studying advice that proved to be quite helpful.

Manning has failed to present evidence that her dismissal was due to race or that the RAR program was related her to dismissal in any way. The only evidence of differential treatment Manning offers is her testimony that a Caucasian student known only as "Tracy" told her that she was advised by Dr. Pearson to study from old exams, while Dr. Pearson did not give Manning the same advice. As the District Court noted, this testimony about Tracy's statement is hearsay and therefore may not be considered at summary judgment. Philbin v. Trans Union Corp., 101 F.3d 957, 961 n.1 (3d Cir. 1996). Even if the testimony could be considered, Dr. Pearson's dispensation of different studying advice to two different students is not sufficient to raise an inference of discrimination.

Because Manning fails to present a prima facie case of discrimination, we need not consider the later steps of the McDonnell Douglas test. We affirm the District Court's grant of summary judgment as to Manning's race discrimination claims.

10

## II.

To establish a substantive due process claim, a plaintiff must show that she was deprived of a fundamental property right through an arbitrary and deliberate abuse of authority. Indep. Enter., Inc. v. Pittsburgh Water and Sewer Auth., 103 F.3d 1165, 1179-80 (3d Cir. 1997). This Court has strongly suggested that the right to continued graduate education is not protected by substantive due process. Mauriello v. Univ. of Medicine and Dentistry of New Jersey, 781 F.2d 46, 50 (3d Cir. 1986) (noting that such an interest bears "'little resemblance to the fundamental interests that previously have been viewed as implicitly protected by the Constitution.'") (quoting Regents of Univ. of Michigan v. Ewing, 474 U.S. 214, 229-30 (1985) (Powell, J., concurring)). We need not decide that issue here, however, because Manning has presented no evidence of an arbitrary exercise of authority.

In Regents, the Supreme Court rejected a student's claim that his dismissal from a joint undergraduate and medical school program constituted arbitrary action, noting that:

> When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

474 U.S. at 225. See also Mauriello, 781 F.2d at 51 ("In an educational setting, a student bears a heavy burden in persuading the courts to set aside a faculty's judgment of academic performance.").

11

Manning has not satisfied her burden here. Even if Dr. Ryan's conduct toward Manning was unfair, there is no evidence that Manning's dismissal was motivated by any factor other than her failing grades in numerous classes over two years. The defendants' academic judgment in dismissing Manning was "not beyond the pale of reasoned academic decision-making," Regents, 474 U.S. at 227-28, and her substantive due process claim therefore fails. See also Mauriello, 781 F.2d at 52 (in entering judgment for defendants on a substantive due process claim, noting that "[a]lthough there may have been personality conflicts between plaintiff and some of the faculty members, the evidence does not permit a finding that the plaintiff's dismissal was for reasons other than the quality of her academic performance.").

III

Manning argues that procedural due process was not satisfied because Dr. Ryan and Dr. Sterling made material misrepresentations that prevented her from exercising her rights, and the Committee proceedings were not adequate.

In Board of Curators of the University of Missouri v. Horowitz, 435 U.S. 78 (1978), the Supreme Court found no procedural due process violation where a student was dismissed from medical school for academic reasons, finding that "[t]he school fully informed respondent of the faculty's dissatisfaction with her clinical progress and the danger that this posed to timely graduation and continued enrollment" and that "[t]he

12

ultimate decision to dismiss respondent was careful and deliberate." Id. at 85. Interpreting Horowitz, this Court has held that "when a student is discharged for academic reasons, an informal faculty evaluation with the student is all that is required." Mauriello, 781 F.2d at 51. The Mauriello Court found adequate process where a student dismissed from a PhD program "was informed of her academic deficiencies, was given an opportunity to rectify them during a probationary period before being dismissed, and was allowed to present her grievance to the graduate committee." Id. at 52.

In light of these cases, the procedure provided to Manning was clearly sufficient. Manning was given fair warning that she had been placed on probation and was in danger of dismissal. She presented her position to an eight-member board, and a vote of that board was required for her dismissal. Manning was also permitted a limited appeal to the Dean. Even if, as she claims, Dr. Ryan or Dr. Sterling gave her inaccurate information about her appeal rights, all relevant information about Temple's appeals process was contained in the Student Handbook, which was easily available to Manning. We conclude that, in light of the great deference that we must allow academic judgments, Temple's dismissal of Manning satisfied procedural due process requirements.

## CONCLUSION

For all of the reasons discussed above, we conclude that the District Court's grant of summary judgment was proper. We will accordingly affirm the District Court's order.

13