J-A22029-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| PATRICIA B. GRADY, AS EXECUTRIX AND PERSONAL REPRESENTATIVE OF THE ESTATE OF STEPHEN P. GRADY | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | |
| v. | : : | |
| | : | No. 53 MDA 2021 |
| | : | |
| AERO-TECH SERVICES, INC. D/B/A AERO-TECH SERVICES AND ZACH HURST & DAVID PEACHEY, INDIVIDUALLY | : : : : : | |

Appeal from the Order Entered December 22, 2020
In the Court of Common Pleas of Lancaster County Civil Division at
No(s):  CI-20-03159

BEFORE:  BOWES, J., OLSON, J., and KING, J.

MEMORANDUM BY OLSON, J.:                    **FILED:  MARCH 8, 2022**

Appellant, Patricia B. Grady, as executrix and personal representative of the Estate of Stephen P. Grady, appeals from the order entered on December 22, 2020.  The December 22, 2020 order sustained the preliminary objections in the nature of a demurrer that were filed by Aero-Tech Services, Inc. d/b/a Aero-Tech Services ("Aero-Tech"), Zach Hurst, and David Peachey (hereinafter, collectively, "the Defendants") and dismissed Appellant's complaint.  We affirm.

On April 4, 2020, Appellant filed a complaint against the Defendants. The trial court thoroughly summarized the factual allegations and averments in Appellant's complaint:

[Appellant,] Patricia Grady[,] is the widow of Stephen Grady[; Stephen Grady] died in an airplane crash on April 19, 2018. The aircraft involved in the accident which is the subject of this litigation was a 2001 Cirrus SR22 G1, registration number N451TD, serial number 0064 ("Cirrus aircraft") owned and piloted by James J. Durkin, the pilot in charge of the aircraft ("PIC Durkin"). Stephen Grady was the only passenger on board the Cirrus aircraft on April 19, 2018. Stephen Grady was not trained as a pilot, nor did he have experience operating aircraft. The Cirrus aircraft was operated solely by PIC Durkin on April 19, 2018 under the provisions of 14 C.F.R. Part 91 as a personal flight. The Cirrus aircraft departed the Lancaster Airport at 7:34 a.m. with a destination of South Bend, [Indiana]. The Cirrus aircraft crashed in rural central Pennsylvania at approximately 8:44 a.m.  Prior to the commencement of the flight, PIC Durkin filed an Instrument Flight Rules ("IFR") flight plan and he had the appropriate certificates and recent instrument flight experience to operate the Cirrus aircraft under IFR on the date of the accident. The Cirrus aircraft was not certified for flight in known icing conditions.

[In 2011, PIC Durkin began taking flight instruction with Defendant Aero-Tech.  Defendant Aero-Tech "is in the business of providing initial and recurrent flight training programs[,] as well as classroom training for a variety of general aviation and business aircraft."  It employed both Defendant Hurst and Defendant Peachey as Certificated Flight Instructors ("CFI").]

On September 5, 2012, PIC Durkin passed his "private pilot check ride," which is the aerial practicum required prior to obtaining a private pilot license.  [PIC Durkin began taking instruction for Instrument Rating certification with Defendant Aero-Tech on September 14, 2012.  This certification would "enable him to operate an airplane during instrument meteorological conditions."  "Most, if not all of the flight instruction for the Instrument Rating certification was conducted by Defendant Peachey."]

PIC Durkin first flew the aircraft involved in the accident on January 31, 2014 and on that same day, PIC Durkin's logbook notes that he received instruction titled "Cirrus demo/intro."

On April 1, 2014, Durkin passed his Instrument Rating check ride permitting him to operate under IFR. Between January 31, 2014 and April 19, 2018, PIC Durkin's logbook contains approximately [90] logged training flights. PIC Durkin flew the Cirrus aircraft exclusively from April 9, 2014 until April 19, 2018. In the six months prior to the accident, PIC Durkin received flight instruction on at least six occasions from Defendant Peachey, Defendant Hurst, or other unknown instructors employed by Defendant Aero-Tech.

The Cirrus aircraft was equipped with an S TEC 55 autopilot and with a Cirrus Ballistic Parachute System known as ["CAPS"]. [CAPS] is designed to prevent uncontrolled flight into terrain in the event of serious and unrecoverable control issues during flight. [CAPS] consists of a ballistic rocket-fired parachute that extracts a large, rotund parachute attached to the airframe of the aircraft. When utilized properly, [CAPS] has been shown to drastically reduce pilot and passenger fatalities. The Pilot's Operating Handbook ("POH") for the Cirrus aircraft at "Normal Procedures, Pre-flight walk-around" states at item 1 to remove the safety pin on the CAPS activation handle. The removal of the safety pin from the CAPS activation handle is the first step that must be taken by a pilot when entering the cabin and beginning the preflight check of the aircraft. The POH for the Cirrus aircraft also states at the "Before Starting Engine" checklist to verify the removal of the safety pin from the CAPS handle. After the pilot completes preflight actions and when the aircraft is ready for departure, the POH for the Cirrus aircraft lists as the first item on the "before takeoff checklist" to verify that the pin has been removed from the CAPS handle. The wreckage of the Cirrus aircraft showed that the safety pin remained in the CAPS parachute handle, exhibiting that PIC Durkin did not remove the pin when executing his preflight checklist. Accordingly, [CAPS] was not able to be activated by PIC Durkin prior to impact.

The Cirrus Flight Operations Manual for instructors provides that if the pilot has loss of aircraft control, the pilot must immediately[:] 1) attempt manual recovery if able, or 2) engage autopilot if within limits, or 3) activate CAPS. On April 19, 2018, PIC Durkin was unable to manually recover control after losing control of the Cirrus aircraft in a left turn. PIC Durkin did not engage the autopilot, nor did he activate the

CAPS after losing control of the Cirrus aircraft in the left turn.
. . .

[Appellant alleged] that Defendants Peachey and Hurst failed to teach [CAPS] to PIC Durkin and that[,] had Defendants Peachey and Hurst correctly taught [CAPS] to PIC Durkin, PIC Durkin would have had the option of immediately deploying the lifesaving CAPS [] when he lost control of the Cirrus aircraft in the left turn on April 19, 2018. [Appellant] also [alleged] that had either Defendant Peachey or Defendant Hurst taught PIC Durkin to engage the autopilot in loss of control situations, the fatal accident on April 19, 2018 would not have occurred.

Trial Court Opinion, 5/1/21, at 3-5.

Appellant claimed that the Defendants were negligent in that they failed to properly instruct PIC Durkin in the use and operation of both CAPS and the autopilot on the Cirrus aircraft and that Defendant Aero-Tech was negligent in failing to ensure that its flight instructors were qualified to train PIC Durkin in the use of CAPS.

The Defendants filed preliminary objections to Appellant's complaint. As is relevant to the current appeal, the Defendants claimed that Appellant's complaint failed to set forth a valid cause of action and must be dismissed, as the complaint solely alleged that the Defendants committed educational malpractice – which is a tort that is not recognized in Pennsylvania. *See* Defendants' Preliminary Objections, 4/29/20, at 5-6.

On December 22, 2020, the trial court sustained the Defendants' preliminary objection in the nature of a demurrer and dismissed Appellant's complaint. Trial Court Order, 12/22/20, at 1-2. As the trial court held: "[Appellant's] complaint fails as a matter of law as it is solely based upon a

theory of educational malpractice against the Defendants. Pennsylvania courts have not permitted cases of negligence resulting from alleged educational malpractice to persist." ***Id.*** at 1 n.1.

Appellant filed a timely notice of appeal; Appellant raises one claim to this Court:

> Whether the [trial court] erred in granting Defendant[s'] preliminary objections in the nature of a demurrer when all of the well-pled facts support a legally sufficient cause of action sounding in negligence, where the educational malpractice doctrine should not be applied to specialized training for ultra-hazardous activities and when public policy supports holding such training facilities accountable for failing to adequately train pilots resulting in fatalities that would otherwise be avoided[?]

Appellant's Brief at 6 (some capitalization omitted).

We have stated:

> A preliminary objection in the nature of a demurrer is properly sustained where the contested pleading is legally insufficient. Preliminary objections in the nature of a demurrer require the court to resolve the issues solely on the basis of the pleadings; no testimony or other evidence outside of the complaint may be considered to dispose of the legal issues presented by the demurrer. All material facts set forth in the pleading and all inferences reasonably deducible therefrom must be admitted as true.
>
> In determining whether the trial court properly sustained preliminary objections, the appellate court must examine the averments in the complaint, together with the documents and exhibits attached thereto, in order to evaluate the sufficiency of the facts averred. The impetus of our inquiry is to determine the legal sufficiency of the complaint and whether the pleading would permit recovery if ultimately proven. This Court will reverse the trial court's decision regarding preliminary objections only where there has been

an error of law or abuse of discretion. When sustaining the preliminary objections will result in the denial of claim or a dismissal of suit, the preliminary objections may be sustained only where the case is free and clear of doubt.

*Hill v. Ofalt*, 85 A.3d 540, 547-548 (Pa. Super. 2014) (quotation marks, citations, and corrections omitted).

On appeal, Appellant acknowledges:  that her negligence claims sound in educational malpractice; that Pennsylvania courts have not recognized negligence claims sounding in educational malpractice; and, that Pennsylvania law does not permit educational malpractice claims to succeed against traditional educational institutions.  *See* Appellant's Brief at 17, 26, and 48. Nevertheless, Appellant contends that she has stated a valid cause of action because students, such as PIC Durkin, pay flight schools to teach them a precise activity, which Appellant contends is ultrahazardous, and because Appellant specifically alleged that:  the accident was caused by PIC Durkin's failure to engage CAPS; the Defendants were negligent in failing to teach CAPS to PIC Durkin; and, Defendant Aero-Tech was negligent in failing to ensure that its flight instructors were qualified to train PIC Durkin in the use of CAPS. *See* Appellant's Brief at 17, 20, 47, and 49.

Appellant's claims fail for the reasons stated in the well-written and scholarly opinion of the able trial court judge, the Honorable Leonard G. Brown.  Therefore, we affirm on the basis of Judge Brown's thorough, March 1, 2021, opinion and adopt it as our own.  In any future filing with this or any other court addressing this ruling, the filing party shall attach a copy of Judge Brown's March 1, 2021 opinion.

Order affirmed.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/8/2022

R. 57 a

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed*****
Mar 01 2021 09:14AM
Audrey Conrad

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CIVIL ACTION – LAW

PATRICIA B. GRADY, as Executrix and :
Personal Representative of the Estate of :
STEPHEN P. GRADY :
   Plaintiff :
            :
            :
v.           :
            : No. CI-20-03159
            :
AERO-TECH SERVICES, INC., d/b/a AERO- :
TECH SERVICES, and ZACH HURST, and :
DAVID PEACHEY, individually :
    Defendants :

EXHIBIT
B

## 1925(A) OPINION

This case involves the tragic crash of a private airplane that took the lives of two people, the pilot and his passenger. However, because no legal basis exists in Pennsylvania law to hold defendants liable for the crash, the court dismissed plaintiff's educational malpractice case as one barred under Pennsylvania law. It is true that liability for the alleged improper education of those engaged in an inherently dangerous activity is a matter of first impression in Pennsylvania. The court concludes that public policy suggests that schools, and their regulating, accrediting, and certifying agencies, not courts, need to make curriculum decisions.

This opinion is written pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure. Plaintiff, Patricia B. Grady (hereinafter "Plaintiff") appeals this court's order dated December 18, 2020 to the Pennsylvania Superior Court for the reasons stated in her concise statement of errors dated February 4, 2021. The December 18, 2020 order should be affirmed for the reasons set forth below.

## I. PROCEDURAL HISTORY

Plaintiff, Patricia Grady initiated this case by filing a complaint on April 7, 2020. The complaint contains four counts, Count I – Wrongful Death Through Negligence as to David Peachey (hereinafter "Defendant Peachey"), Count II – Wrongful Death Through Negligence as

to Zach Hurst (hereinafter "Defendant Hurst"), Count III – Respondeat Superior as to Aero-Tech

Services, Inc. d/b/a Aero-Tech Services (hereinafter "Defendant Aero-Tech"), and Count IV –

Negligence as to Defendant Aero-Tech.

On April 28, 2020, Defendant Peachey, Defendant Hurst, and Defendant Aero-Tech

(hereinafter collectively "Defendants") filed preliminary objections to Plaintiff's complaint

under Pennsylvania Rule of Civil Procedure 1028(a)(4) in the nature of a demurrer. Specifically,

Defendants contend that the complaint fails as a matter of law for four reasons:

1. Plaintiff's well-pled facts establish that the pilot was negligent per se and the pilot's negligence per se should not allow the trial court to consider the Defendant's contribution to negligence.

2. Defendants owe no duty to the decedent as a matter of law because they had no contractual, direct, or professional relationship with the decedent.

3. Plaintiff cannot establish causation as a matter of law because it was the pilot's negligence and not the Defendants that was the causation of the injury.

4. Even if Plaintiff properly pled the elements of a negligence claim, such claims sound in educational malpractice, a tort that is not recognized under Pennsylvania law.

Defendants filed their memorandum of law simultaneously with the preliminary objections. On

May 18, 2020, Plaintiff filed a response and memorandum of law in opposition to Defendants'

preliminary objections. On May 21, 2020, Defendants filed a memorandum of law in reply to

Plaintiff's memorandum of law.

On September 9, 2020, the file was forwarded to chambers for disposition. On December

18, 2020, the court issued an order overruling Defendants' first three preliminary objections and

sustained the fourth objection. As a result, the complaint was dismissed. On January 6, 2021,

Plaintiff filed a notice of appeal to the Pennsylvania Superior Court. On January 20, 2021, the

court issued an Order directing the Plaintiff to file her concise statement of errors. On February

4, 2021, Plaintiff filed her concise statement of errors claiming one error.

## II. FACTUAL HISTORY

Plaintiff, Patricia Grady is the widow of Stephen Grady who died in an airplane crash on April 19, 2018. The aircraft involved in the accident which is the subject of this litigation was a 2001 Cirrus SR22 G1, registration number N451TD, serial number 0064 ("Cirrus aircraft") owned and piloted by James J. Durkin, the pilot in charge of the aircraft ("PIC Durkin"). Stephen Grady was the only passenger on board the Cirrus aircraft on April 19, 2018. Stephen Grady was not trained as a pilot, nor did he have experience operating aircraft. The Cirrus aircraft was operated solely by PIC Durkin on April 19, 2018 under the provisions of 14 C.F.R. Part 91 as a personal flight. The Cirrus aircraft departed the Lancaster Airport at 7:34 a.m. with a destination of South Bend, IN. The Cirrus aircraft crashed in rural central Pennsylvania at approximately 8:44 a.m. Prior to the commencement of the flight, PIC Durkin filed an Instrument Flight Rules ("IFR") flight plan and he had the appropriate certificates and recent instrument flight experience to operate the Cirrus aircraft under IFR on the date of the accident. The Cirrus aircraft was not certified for flight in known icing conditions.

On September 5, 2012, PIC Durkin passed his "private pilot check ride," which is the aerial practicum required prior to obtaining a private pilot license. PIC Durkin first flew the aircraft involved in the accident on January 31, 2014 and on that same day, PIC Durkin's logbook notes that he received instruction titled "Cirrus demo/intro." On April 1, 2014, Durkin passed his Instrument Rating check ride permitting him to operate under IFR. Between January 31, 2014 and April 19, 2018, PIC Durkin's logbook contains approximately ninety logged training flights. PIC Durkin flew the Cirrus aircraft exclusively from April 9, 2014 until April 19, 2018. In the six months prior to the accident, PIC Durkin received flight instruction on at least six occasions from Defendant Peachey, Defendant Hurst, or other unknown instructors employed

3

by Defendant Aero-Tech.

The Cirrus aircraft was equipped with an S TEC 55 autopilot and with a Cirrus Ballistic Parachute System known as a "CAPS" system. The CAPS system is designed to prevent uncontrolled flight into terrain in the event of serious and unrecoverable control issues during flight. The CAPS system consists of a ballistic rocket-fired parachute that extracts a large, round parachute attached to the airframe of the aircraft. When utilized properly, the CAPS system has been shown to drastically reduce pilot and passenger fatalities. The Pilot's Operating Handbook ("POH") for the Cirrus aircraft at "Normal Procedures, Pre-flight walk-around" states at item 1 to remove the safety pin on the CAPS activation handle. The removal of the safety pin from the CAPS activation handle is the first step that must be taken by a pilot when entering the cabin and beginning the preflight check of the aircraft. The POH for the Cirrus aircraft also states at the "Before Starting Engine" checklist to verify the removal of the safety pin from the CAPS handle. After the pilot completes preflight actions and when the aircraft is ready for departure, the POH for the Cirrus aircraft lists as the first item on the "before takeoff checklist" to verify that the pin has been removed from the CAPS handle. The wreckage of the Cirrus aircraft showed that the safety pin remained in the CAPS parachute handle, exhibiting that PIC Durkin did not remove the pin when executing his preflight checklist. Accordingly, the CAPS system was not able to be activated by PIC Durkin prior to impact.

The Cirrus Flight Operations Manual for instructors provides that if the pilot has loss of aircraft control, the pilot must immediately, 1) attempt manual recovery if able, or 2) engage autopilot if within limits, or 3) activate CAPS. On April 19, 2018, PIC Durkin was unable to manually recover control after losing control of the Cirrus aircraft in a left turn. PIC Durkin did not engage the autopilot, nor did he activate the CAPS after losing control of the Cirrus aircraft

in the left turn. Plaintiff believes that Defendants Peachey and Hurst failed to teach the CAPS system to PIC Durkin and that had Defendants Peachey and Hurst correctly taught the Cirrus CAPS system to PIC Durkin, PIC Durkin would have had the option of immediately deploying the lifesaving CAPS system when he lost control of the Cirrus aircraft in the left turn on April 19, 2018. Plaintiff also asserts that had either Defendant Peachey or Defendant Hurst taught PIC Durkin to engage the autopilot in loss of control situations, the fatal accident on April 19, 2018 would not have occurred.

## III. ISSUE ON APPEAL

In her concise statement of errors complained of on appeal dated February 4, 2021, Plaintiff raises one issue on appeal:

> Whether Pennsylvania courts should apply the educational malpractice doctrine in the context of the specialized training of flight instruction, an inherently dangerous activity, specifically where proper training by the instructors on utilization of the Cirrus Airframe Parachute System has been shown to effectively eliminate pilot and passenger fatalities in otherwise unsurvivable aircraft accidents.

## IV. LAW

### A. Standard of Review

A demurrer is an assertion that a complaint does not set forth a cause of action or a claim on which relief can be granted. Binswanger v. Levy, 457 A.2d 103, 104 (Pa. Super. 1983). Where a doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling it. Wawa, Inc. v. Alexander J. Litwornia & Associates, 817 A.2d 543, 544 (Pa. Super. 2003). A demurrer by a defendant admits all relevant facts sufficiently pleaded in the complaint and all inferences fairly deducible therefrom, but not conclusions of law or unjustified inferences. Binswanger, supra at 104. In ruling on a demurrer, the trial court may consider only such matters as arise out of the complaint itself. Lerner v. Lerner, 954 A.2d 1229, 1234–35 (Pa.

5

Super. 2008). All material facts set forth in the complaint as well as all inferences reasonably deducible therefrom are admitted as true for the purpose of appellate review. Id. A trial court's sustaining of preliminary objections in the nature of a demurrer should be sustained only if, assuming the averments of the complaint to be true, the plaintiff has failed to assert a legally cognizable cause of action and the law says with certainty that no recovery is possible. Kramer v. Dunn, 749 A.2d 984, 990 (Pa. Super. 2000).

### B. Educational Malpractice

Educational malpractice claims fall into one of three different categories: (1) the student alleges that the defendant-school negligently failed to provide him or her with adequate skills; (2) the student alleges that defendant-school negligently diagnosed or failed to diagnose the student's learning or mental disabilities; or (3) the student alleges that the defendant-school negligently supervised his or her training. See Sheesley v. The Cessna Aircraft Co., CIV. 02-4185-KES, 2006 WL 1084103, at *15 (D.S.D. Apr. 20, 2006).[1] In addition to claims brought against a school by the student himself, third parties injured by the conduct of the allegedly inadequately trained student may also attempt to assert educational malpractice claims against a school. Moss Rehab. v. White, 692 A.2d 902, 905 (Del. 1997). Where a plaintiff contests the substance and manner of a student's training, plaintiffs' claims encompass the traditional aspects of education, and thus, sound in educational malpractice. Id. Educational malpractice claims against a flight school allege the pilot was not taught what he needed to know to be able to safely fly the aircraft. Glorvigen v. Cirrus Design Corp., 796 N.W.2d 541, 553 (Minn. App. 2011),

---

[1] Cavaliere v. Duff's Bus. Inst., 605 A.2d 397, 399 (Pa. Super. 1992) (Pennsylvania educational malpractice case alleging failure to provide "adequate, proper and quality" instruction); Agostine v. Sch. Dist. of Philadelphia, 527 A.2d 193 (Pa. Cmmw. 1987) (Pennsylvania educational malpractice case alleging negligent diagnoses of mental disability); McKnight v. City of Philadelphia, 445 A.2d 778 (Pa. Super. 1982) (Pennsylvania case by a student against their school alleging negligent supervision within the program resulting in injury).

aff'd, 816 N.W.2d 572 (Minn. 2012); Dallas Airmotive, Inc. v. FlightSafety Intern., Inc., 277 S.W.3d 696, 701 (Mo. App. W. Dist. 2008).

## V. DISCUSSION

### A. Pennsylvania Law on Educational Malpractice

In its research, the court found five Pennsylvania cases where the issue of educational malpractice has been analyzed beyond a mere mention. Swartley v. Hoffner, 734 A.2d 915 (Pa. Super. 1999); Cavaliere v. Duff's Bus. Inst., 605 A.2d 397 (Pa. Super. 1992); Agostine v. Sch. Dist. of Philadelphia, 527 A.2d 193 (Pa. Cmmw. 1987); Aubrey v. Sch. Dist. of Philadelphia, 437 A.2d 1306 (Pa. Cmmw. 1981); and Alley v. Bellwood Antis Sch. Dist., 27 Pa. D. & C.3d 307 (Pa. Com. Pl. 1983). All these cases leave no doubt that Pennsylvania does not recognize educational malpractice as a valid cause of action.

The Pennsylvania Superior Court in Cavaliere v. Duff's Business Institute defines educational malpractice as a claim brought against an educational institution where "the allegation is simply that the educational institution failed to provide a quality education." Cavaliere, supra at 403. In Cavaliere, the plaintiffs were students enrolled in a two-year court reporting school facilitated by the defendant. The plaintiffs purchased their books and paid their tuition for the first two quarters of the program. Plaintiffs alleged that the instruction during the first quarter of the program was deficient such that they were unable to advance to the second quarter. Having to repeat the first quarter, the plaintiffs elected to withdraw from the program. The Pennsylvania Superior Court rejected plaintiffs' claims finding that the claims sound in educational malpractice.

> The sole allegation is that the instruction and instructors provided by the school were generally inadequate and of low quality. Such a complaint invites the court to enter into precisely the kind of generalized review of the entire course of instruction that so many other courts have wisely refrained from doing.

7

Id. at 404. The Cavaliere court noted that the conflicting theories of the science of pedagogy prevented the construction of a workable standard of care for these cases and that public schools, private schools, and trade schools are regulated by Pennsylvania statutes. Id. at 400-401. The Pennsylvania Superior Court held that it would be unwise to have trial courts attempt to formulate an adequate standard of care and link causation between alleged breach of duty owed to a plaintiff and alleged damages against schools that are already regulated by a statutory scheme. Id.

Upon review of Pennsylvania case law regarding educational malpractice, the court can find no cases that have permitted negligence claims that challenge the quality of education to proceed under a theory of educational malpractice.[2] Claims are permitted against a school that are based in breach of contract (i.e. the school ignored or violated portions of the written contract) or claims resulting from negligent supervision during the instruction process (i.e. a student was injured during the course of instruction under the school's supervision). See Swartley, supra; McKnight, supra. The Pennsylvania cases that have not permitted causes of actions that sound in educational malpractice have done so based on public policy grounds, including the four grounds analyzed by the court in Part V.C.1-4 of this opinion. See Cavaliere, supra at 400-401, 403 fn. 2 (recognizing that permitting educational malpractice claims would likely result in a "litigation explosion" and that the nature of educational malpractice claims "prevents a finding of legal causation"); Swartley, supra at 921 (recognizing Pennsylvania

---

[2] Expanding its research to federal courts applying or reciting Pennsylvania law on the issue of educational malpractice, the court again found no support to permit a cause of action based in a claim of educational malpractice to proceed. See Vurimindi v. Fuqua Sch. of Bus., No. CIV.A 10-234, 2010 WL 3419568 (E.D. Pa. Aug. 25, 2010), aff'd, 435 F. App'x 129 (3d Cir. 2011); In re Allegheny Health, Educ. and Research Found., 321 B.R. 776 (Bankr. W.D. Pa. 2005); Manning v. Temple U., CIV.A. 03-4012, 2004 WL 3019230 (E.D. Pa. Dec. 30, 2004), aff'd, 157 Fed. Appx. 509 (3d Cir. 2005) (unreported); Dillon v. Ultrasound Diagnostic Schools, CIV. A. 96-8342, 1997 WL 805216 (E.D. Pa. Dec. 18, 1997) (unreported).

8

court's policy of nonintervention in purely academic matters and that courts should not become involved unless the process itself has been found to be biased, prejudicial or lacking in due process); Agostine, supra at 196 (recognizing issues with formulating a standard of care in that "proper education and training does not have a fixed meaning but varies with the needs of the child").

The specific facts of this case appear to be a matter of first impression in Pennsylvania. In reviewing the well-pled facts, the current law regarding educational malpractice in Pennsylvania, the stated rationale for why Pennsylvania does not recognize educational malpractice, and considering the persuasive authorities of other jurisdictions interpreting similar factual scenarios under similar legal frameworks, the court concludes that the clear interpretation of existing Pennsylvania law is to find that Plaintiff's claims sound in educational malpractice and thus the court cannot permit Plaintiff's claims to proceed.

B. Other Jurisdictions Denial of Educational Malpractice Claims in Similar Factual Scenarios

*1. Law in Other States*

Looking to other jurisdictions, the court can find no states other than Montana[3] that permit educational malpractice claims to be brought against public schools, private schools, trade schools, or specialty schools. There have been several cases where state courts of other jurisdictions have addressed educational malpractice claims against flight schools (and other schools where the subject matter is arguably "inherently dangerous" such as utility pole climbing and teaching the physically disabled to drive). These cases are of special benefit to the analysis of the facts of this case and highlight why the majority of states refuse to permit negligence claims that challenge the quality of instruction to proceed against an educational entity.

---

[3] B. M. by Burger v. State, 649 P.2d 425 (Mont. 1982).

9

### i. Waugh v. Morgan Stanley & Co.

In Waugh, the pilot in charge ("PIC") and three passengers were en route from Kansas to Illinois, following a business trip in January 2006. As the PIC approached for landing at the airport, the aircraft crashed, killing all four occupants on board. Prior to the accident, the PIC received flight simulator training, flight instruction, and a five-hour flight observation and instruction from the defendants. The accident aircraft crashed at night while in a landing traffic pattern to land at the Illinois airport. Much of the PIC's five-hour flight observation and instruction occurred in the aircraft he was flying at the time of the accident, in the landing traffic pattern, and in the same location as the crash site. Plaintiffs did not argue that the PIC was not properly qualified to pilot the subject aircraft under FAA regulations.

The trial court entered summary judgment in favor of the flight school on the basis that Illinois does not recognize educational malpractice claims. The appellate court concluded that the plaintiffs' claims asserted that defendants failed to properly train the PIC in how to fly and land the aircraft; accordingly, such claims clearly sound in educational malpractice. Waugh v. Morgan Stanley and Co., Inc., 966 N.E.2d 540 (Ill. App. 1st Dist. 2012). The appellate court noted the four public policy grounds under which courts of other states have refused to recognize claims of educational malpractice and concluded that such policy grounds properly apply to flight training schools and flight instructors. Id. at 552. The public policy grounds underpinning the educational malpractice bar are compelling and persuasive. These grounds include: (1) the lack of a satisfactory standard of care by which to evaluate an educator; (2) the inherent uncertainties about causation and the nature of damages in light of such intervening factors as a student's attitude, motivation, temperament, past experience, and home environment; (3) the potential for a flood of litigation against schools; and (4) the possibility that such claims will

10

embroil the courts into overseeing the day-to-day operations of schools. Id. These public policy grounds are discussed in more detail below.

ii. Glorvigen v. Cirrus Design Corp.

In Glorvigen, the PIC of a Cirrus SR22, the same type of plane at issue in this case, crashed his plane killing himself and a passenger. The passenger's family sued Cirrus, the manufacturer of the PIC's plane which also provided two days of "transition training" to the PIC after he bought the Cirrus SR22. The FAA did not require Cirrus to provide transition training, but it was included by the plane manufacturer in the purchase price of the plane. Transition training is a specialized type of training that is provided when a licensed pilot learns to fly a new type of plane to teach them the intricacies of the new plane. The plaintiffs' claim is that Cirrus undertook a duty to provide the PIC with flight training and that Cirrus breached an implied warranty of merchantability by omitting a flight lesson regarding how to handle the plane via use of instruments when the pilot loses visibility in the clouds. The Minnesota Court of Appeals citing the four public policy grounds held that determining whether the transition training was ineffective because the instructor failed to provide a flight lesson on a specific topic would involve "an inquiry into the nuances of the educational process, which is exactly the type of determination that the educational-malpractice bar is meant to avoid." Glorvigen, supra at 553.

iii. Dallas Airmotive, Inc. v. FlightSafety Intern., Inc.

In Dallas Airmotive, the plaintiff brought an action against the flight school that trained the PIC who crashed a Piper turboprop airplane after he encountered engine failure and was not properly able to feather the propeller and thus avoid the crash. The PIC held an FAA commercial pilot certificate and FAA-certified flight instructor certificate. While he had extensive experience as a pilot, he had no experience in operating a turboprop aircraft prior to attending a course

11

offered by the defendant flight school nine days before the crash. It was undisputed that the flight instructor knew its FAA–approved simulator did not accurately replicate the extreme drag a pilot would experience in a turboprop engine failure and that it nonetheless continued to use the simulator. The plaintiff alleged the flight school's curriculum "inadequately prepared" the pilot to handle the situation and that the flight school had a duty to warn the pilot of the known dangers of shutting down an engine in flight without the ability to properly feather the propeller.

The Missouri Court of Appeals refused to recognize educational malpractice as a valid cause of action or to carve out an exception for pilot training. The Dallas Airmotive court noted that this was not a case of an injury sustained during the instruction but completely centered around the quality of the instruction. The court noted:

> In order to recover for negligence, a plaintiff must prove the existence of a duty on the part of the defendant to protect the plaintiff from injury, the defendant's failure to perform that duty, and an injury proximately caused by the failure to perform the duty owed. Bunker v. Ass'n of Mo. Elec. Coops., 839 S.W.2d 608, 611 (Mo.App.1992). Whether a duty exists is a matter of law and question for the courts to decide. Id.
>
> The judicial determination of the existence of a duty rests on sound public policy as derived from a calculus of factors: among them, the social consensus that the interest is worthy of protection; the foreseeability of harm and the degree of certainty that the protected person suffered injury; moral blame society attaches to the conduct; the prevention of future harm; consideration of cost and ability to spread the risk of loss; the economic burden upon the actor and the community and others. Id.

Dallas Airmotive, supra at 699. "Missouri, along with most other jurisdictions that have considered the issue, has found that educational malpractice claims are not cognizable because there is no duty." Id. The court found that the four public policy considerations apply to for-profit flight instruction schools and that "[p]ublic policy also suggests that schools, and their regulating, accrediting, and certifying agencies, not courts, need to make curriculum decisions." Id. at 701.

12

R. 69 a

### iv. Page v. Klein Tools, Inc.

In Page, an apprentice linesman brought a cause of action against a private trade school alleging that it negligently failed to instruct him regarding use of safety equipment during a three-week course on climbing wooden utility poles. The Michigan Supreme Court held that this was a claim of educational malpractice not recognized in Michigan. In its analysis, the Page court cited many public policy grounds for why courts have refused to recognize claims of educational malpractice. Page is notable because it is one of the first cases which analyzed educational malpractice outside of the public school setting and addressed a trade school specifically teaching an inherently dangerous activity. The opinion in Page is also one of the first cases to analyze the public policy concerns surrounding educational malpractice claims in depth. The Michigan Supreme Court concluded that "[a]llowing individuals such as plaintiff to assert claims of negligent instruction would avoid the practical reality that, in the end, it is the student who is responsible for his knowledge, including the limits of that knowledge." Page v. Klein Tools, Inc., 610 N.W.2d 900, 906 (Mich. 2000).

### v. Moss Rehab. v. White,

Moss Rehab Driving School ("Moss Rehab") provided driver evaluation and training for individuals with physical disabilities. Moss Rehab would assess a disabled applicant to determine whether the applicant was capable of learning to drive a motor vehicle and then provide that person with driver training. Moss Rehab conducted driver training with a Mr. Sharp and noted that he struggled with being a little jerky with the steering wheel, needing to slow down and struggling with his turn radius when making right-hand turns. Mr. Sharp continued with driver training to the point that Moss Rehab thought the issues had been corrected and training was concluded. Mr. Sharp failed his first driver's test because he hit a cone during the

13

exam. He passed the test on his second attempt. Approximately two months after receiving his Delaware driver's license, Mr. Sharp caused a fatal accident while attempting to merge onto a highway exit ramp. The plaintiffs sued Moss Rehab alleging that their negligent training of Mr. Sharp resulted in the fatal accident.

The Delaware Supreme Court noted that driver competency and certification of driver training schools are extensively regulated by statute. The court also focused attention on the analogous case of Moore v. Vandeloo, 386 N.W.2d 108 (Iowa 1986), which involved a licensed chiropractor and the public policy rationale for why educational malpractice claims are disfavored. The Delaware Supreme Court held that a third-party claim for educational malpractice against a driving school is not a cognizable common-law cause of action in Delaware. Just as the General Assembly oversees the licensure of drivers, "[t]he General Assembly is best able to address the competing public policy issues that must be reconciled with regard to recognizing a third-party claim for educational malpractice by a driving school." Moss Rehab, supra at 909.

### 2. Federal Courts Applying State Law

Expanding the search of relevant cases to federal courts applying the laws of states other than Pennsylvania, the court found three cases where a federal court concluded that educational malpractice claims against a flight school could possibly proceed under the law of that state.[4] The remaining cases of educational malpractice claims against flight schools do not permit the claim to proceed because the claims are not recognized in those states, even in the situation of flight schools.

---

[4] The three states being Florida, New York, and Texas.

### i.    In re Cessna 208 Series

The federal district court in Kansas applying Texas law dismissed the defendant flight school's motion for summary judgment in which defendant relied on the educational malpractice bar. The federal court chose not to disturb the ruling of a Texas state trial court allowing claims that the flight school negligently failed to properly instruct the pilots of a specific aircraft on how to avoid ice accumulation, the unusual dangers of airframe icing associated with the specific aircraft, and how to control that aircraft should ice accumulation occur. The prior opinion of the Texas state court judge held that the plaintiff's claims are sufficient to withstand summary judgment under Texas law and was entered prior to the case's removal to federal court. See In re Cessna 208 Series Aircraft Products Liab. Litig., 546 F. Supp. 2d 1153 (D. Kan. 2008).

In re Cessna appears to make a distinction for situations where a flight school is charged with the task of teaching a student one distinct concept, how to fly a specific plane, or how to address the discrete issues associated with a specific plane (such as airframe icing). While it is possible to limit such causes of action to very specific situations, this court is still troubled by the public policy concerns. The trial court would still be required to analyze the flight school's instructional materials to see if they adequately cover ice accumulation concerns, whether their flight simulators accurately simulated such circumstances, and whether the in-flight situational instruction was satisfactory. The trial court would be required to delve into the minutia of how detailed flight instruction and simulation should be to prevent pilot error. The issue of causation is still a concern because there is no way to discern how much of the accident is related to (1) the student's lack of knowledge; (2) how much of the student's lack of knowledge is the result of faulty teaching; or (3) the student's ability to accurately discharge any knowledge – the skill of the pilot. Every plane crash still has the potential to result in double litigation against the

insurance company/estate of the pilot first and then against any flight instructor who ever taught the pilot.

### ii. Newman v. Socata SAS

In Newman, plaintiffs sued the defendant flight school after a deadly plane crash involving a Socata TBM 700B aircraft ("TBM 700"). Seven months prior to the crash, the PIC attended and successfully completed the defendant flight school's program that was designed to train experienced pilots to fly the TBM 700 aircraft. As of the time of the accident, there were at least fifteen reported cases of crashes involving the TBM 700 all of which referenced a "torque roll" or similar condition. Plaintiffs asserted that the flight school owed a duty to warn the PIC of the TBM 700's known, dangerous propensity to torque roll and to otherwise competently train him to fly that type of aircraft.

The federal district court found that "[t]he public policy considerations that are relied upon to bar traditional educational malpractice claims do not carry over to the flight training setting, at least not on the facts of this case." Newman v. Socata SAS, 924 F. Supp. 2d 1322, 1329 (M.D. Fla. 2013). The court reasoned:

> Florida courts have barred "educational malpractice" claims, but it is not likely that the Supreme Court of Florida would extend that bar to the claims against ... a private, for-profit flight school that allegedly owed and breached a duty to warn and train regarding a known lethal propensity of an aircraft.

Id. at 1323. The court concluded that causation and damages would not be as difficult to determine as it would be in the case of the minor public-school pupil. The court noted that Florida courts have long recognized negligence actions based on failure to warn and to apply the doctrine of educational malpractice to flight schools would amount "to a categorical grant of immunity to all entities engaged in instruction in the operation of dangerous equipment." Id. at 1330. Under this blanket of immunity, "[a] flight school could, without the burden of

16

accountability, by omission or even affirmative misstatement encourage its students to engage in conduct that would endanger the student and others." Id. Finding that the Supreme Court of Florida would not likely "sanction a policy absolving the school of responsibility to advise pilots in training of deadly flight characteristics of the subject aircraft that had resulted in a disproportionate number of crashes and fatalities", the federal district court predicted that the Supreme Court of Florida would allow the case to proceed despite Florida's failure to recognize traditional claims of educational malpractice. Id.

Unlike Newman this is not a case of a flight instructor's failure to warn of a death knell torque roll propensity present but not readily apparent in the aircraft. The Cirrus aircraft here is not alleged to have a "deadly flight characteristic" but is equipped with a CAPS system that is conspicuous within the aircraft and clearly addressed both in the Cirrus Flight Operations Manual and preflight checklist. Furthermore, the Newman court analyzed its case and the related public policy implications through a very fact-specific lens without consideration of the greater implications of opening the doors for educational malpractice to be applied on a vast scale. To permit plaintiff's educational malpractice claim here to proceed in Pennsylvania would cause any trade school or instructor to potentially defend litigation based upon a former student's performance errors.

### iii. In re Air Crash Near Clarence Ctr.

In In re Air Crash Near Clarence Center, the defendant flight school was responsible for providing the necessary flight simulator and ground training to the captain and first officer of a Bombardier Dash 8–Q400 ("Dash 8") that crashed in February 2009 on approach to Buffalo Niagara International Airport, killing all 49 people aboard and one person on the ground. Plaintiffs alleged that the flight school never instructed the captain and first officer to use the

17

stick-pusher mechanism in the Dash 8 and trained them using simulators and equipment that did not accurately represent the performance of the Dash 8. The federal district court analyzed prior New York precedent on educational malpractice and held "although the court rejected the nature of the claim before it in [a prior educational malpractice case], this Court cannot conclude with certainty that Plaintiffs would be unable to materially distinguish their claims from those in which the educational malpractice bar has been applied." In re Air Crash Near Clarence Ctr., 09-CV-1039S, 2010 WL 5185106 (W.D.N.Y. Dec. 12, 2010) (unreported).

In re Air Crash Near Clarence Center is unpersuasive because the federal district court granted a motion to remand a matter to state court, not because it found an exception to the educational malpractice bar, but because, in part, it found that the state court could possibly determine that the educational malpractice bar would not apply in that particular situation under New York law. The federal district court distinguished the flight instruction case from the New York educational malpractice precedent which applied heavily to public schools and generalized curricula. The public policy concerns addressed by the majority of educational malpractice cases in other jurisdictions were not considered in the opinion and to date, even after remand of In re Air Crash Near Clarence Ctr., New York has not recognized an exception for educational malpractice cases for flight schools.

C. Public Policy Rationale for Not Permitting Educational Malpractice Claims

The overwhelming majority of states do not permit educational malpractice claims, even in factual scenarios where the training received is for an inherently dangerous activity. The cases most instructive to the court have outlined a compelling public policy rationale of why educational malpractice is disfavored, which are: (1) the lack of a satisfactory standard of care by which to evaluate an educator; (2) the inherent uncertainties about causation and the nature of

18

damages in light of such intervening factors as a student's attitude, motivation, temperament, past experience, and home environment; (3) the potential for a flood of litigation against schools; and (4) the possibility that such claims will embroil the courts into overseeing the day-to-day operations of schools.

### 1. Lack of a Satisfactory Standard of Care

A cause of action seeking damages for acts of negligence in the educational process must be precluded by considerations of public policy, specifically being the absence of a workable standard of care against which the defendant educational institution's conduct may be measured. Moore, supra at 114. Upon review of the caselaw in Pennsylvania and every other jurisdiction, there is no clear definition of the standard of care for a reasonably prudent flight school for instruction on airplane specific safety mechanisms. Simply stated the plaintiff is asking that the court decide how much was Defendant Aerotech required to teach.

> This court would be hard pressed to determine which of several alternative methods of teaching court reporting, or auto repair, or any other specialized business or trade skill was the appropriate one. Nor would it be an easy task to determine why a particular student failed to acquire certain skills after pursuing a course of instruction aimed at teaching those skills.

Cavaliere, supra at 403-404. It is a difficult task to ask a trial court to determine what a reasonable flight school should have or would have taught its students above and beyond that which is required by the FAA for pilot licensure or for the school to maintain its own Part 141 certification through the FAA. Furthermore, 14 C.F.R. § 61.57 provides the requirements that no person may act as a pilot in command of an aircraft carrying passengers unless that PIC has (1) made at least three takeoffs and three landings within the preceding 90 days, (2) the PIC acted as the sole manipulator of the flight controls, and (3) the required takeoffs and landings were performed in an aircraft of the same category, class and type. In cases like the one at bar where

the PIC was licensed in 2012, first flew the Cirrus aircraft in 2014, and subsequently completed the requisites to maintain his private pilot's license, the standard of care of what he should have been taught in his post-licensure flight instruction would be incredibly difficult, or impossible to ascertain.

### 2. Uncertainties About Causation and the Nature of Damages

The Michigan Supreme Court ruled in Page v. Klein Tools, Inc.:

> Since education is a collaborative and subjective process whose success is largely reliant on the student, and since the existence of such outside factors as a student's attitude and abilities render it impossible to establish any quality or curriculum deficiencies as a proximate cause to any injuries, we rule that there is no workable standard of care here and defendant would face an undue burden if forced to litigate its selection of curriculum and teaching methods.

Page, supra at 904 (emphasis added) (quoting Tolman v. CenCor Career Colleges, Inc., Div. of CenCor, Inc., 851 P.2d 203, 205 (Colo. App. 1992)). The court echoes this second public policy concern as it is difficult to determine if the Defendants' instruction on a certain subject would have prevented the Plaintiff's damages. Furthermore, even if a defendant school provided adequate training on every relevant topic, there are a variety of reasons why the student might not have learned the subject matter. The recognition of liability against a flight school would be a great invitation to speculate as to causation since many factors contribute to the quality of a student's education and the quality of his later performance. Dallas Airmotive, supra at 701.

> Factors such as the student's attitude, motivation, temperament, past experience and home environment may all play an essential and immeasurable role in learning.... Consequently, it may be a practical impossibility to prove that the alleged malpractice of the teacher proximately caused the learning deficiency of the plaintiff student.

Ross v. Creighton U., 957 F.2d 410, 414 (7th Cir. 1992) (quotations omitted). A defendant instructor could be a thorough and exemplary teacher, but if the student does not listen, does not apply himself, or is simply not able enough, he will not learn the material.

20

Determination of causation is incredibly difficult in a situation where the pilot is months or years past the training in question and the issue of causation hinges on the deceased pilot's aptitude. Was the pilot properly taught on a topic at some point but became lazy, rusty, or apathetic? Was he knowledgeable, but careless in not properly adhering to his preflight checklist? Did he make the calculated decision to not pull the pin in the CAPS system because he did not intend to utilize the system even in the event of crisis?

Taking an example of training in explosives, which is highly specialized and an inherently dangerous activity—a student can be educated on the type and amount of explosives, length of time fuse, placement of a charge, environmental issues, etc., but the variables in the student's ability to retain this knowledge and accurately execute all of these things in a stressful environment runs the gamut and is often the dispositive factor in an accident. Another complicating factor for the court on causation is the presence of Federal Aviation Regulations which specifically place the responsibility for knowledge to safely fly the aircraft squarely on the shoulders of the pilot in command.[5]

---

[5] Relevant provisions under Part 91 (14 C.F.R. 91) read as follows:

§91.3  Responsibility and authority of the pilot in command.
The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft. ...

§91.9  Civil aircraft flight manual, marking, and placard requirements.
(a) Except as provided in paragraph (d) of this section [providing an exception for helicopters], no person may operate a civil aircraft without complying with the operating limitations specified in the approved Airplane or Rotorcraft Flight Manual, markings, and placards, or as otherwise prescribed by the certificating authority of the country of registry. ...

§91.103  Preflight action.
Each pilot in command shall, before beginning a flight, become familiar with all available information concerning that flight. This information must include— ...

(2) For civil aircraft other than those specified in paragraph (b)(1) of this section, other reliable information appropriate to the aircraft, relating to aircraft performance under expected values of airport elevation and runway slope, aircraft gross weight, and wind and temperature.

§91.505  Familiarity with operating limitations and emergency equipment.

Lastly, tangentially related to the issue of speculative causation and damages is the concern elucidated by the Michigan Supreme Court in Page which states that even where the chain of causation is complete and direct, recovery may sometimes be denied on public policy grounds because:

(1) the injury is too remote from the negligence; or
(2) the injury is too wholly out of proportion to the culpability of the negligent tortfeasor; or
(3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or
(4) because allowance of recovery would place too unreasonable a burden on the defendant; or
(5) because allowance of recovery would be too likely to open the way for fraudulent claims; or
(6) allowance of recovery would enter a field that has no sensible or just stopping point.

Page, supra at 905 (quoting Wilson v. Continental Ins. Cos., 87 Wis.2d 310, 323–324, 274 N.W.2d 679 (1979)). The court finds this rationale compelling in the case *sub judice.*

### 3. *Potential for a Flood of Litigation*

"If a cause of action for educational malpractice is recognized . . ., any malpractice case would have a malpractice action within it." Cavaliere, supra at 403, fn. 2 (quoting Moore, supra at 115). This public policy rationale is especially relevant in the case of flight schools and other specialty schools where the subject matter involves an inherently dangerous activity. "[I]f the court recognizes educational malpractice in this case, virtually every future plane crash will raise the specter of a negligent training claim against the flight school or aviation training center." Sheesley, supra at *17. In cases where potential damages are high, motivations exist to pursue

---

(a) Each pilot in command of an airplane shall, before beginning a flight, become familiar with the Airplane Flight Manual for that airplane, if one is required, and with any placards, listings, instrument markings, or any combination thereof, containing each operating limitation prescribed for that airplane by the Administrator, including those specified in §91.9(b).

22

claims against any and all persons connected to the negligent actor. Every plane crash due to pilot error could lead to a lawsuit against those who trained the pilot for no other reason than they have an attenuated connection to the pilot's actions on the date of the crash since the flight school provided the pilot the knowledge to become licensed by the FAA.

### 4. Possibility that Such Claims Will Necessitate Court Oversight Over Day-to-Day School Operations

Claims regarding the quality of education provided will invariably entail a review of the instructional materials and pedagogical methods employed in addition to administrative functions.[6] The policy rationale against such judicial oversight has been the stated position of Pennsylvania Courts going back to 1937:

> All this [the day-to-day functions of schools], being purely administrative, must be left to persons of experience who have made a life study of it, and certainly is not to be subjected to the consideration of jurists who have little or no training to appraise school systems or their necessities.

Wilson v. Sch. Dist. of Philadelphia, 195 A. 90, 97 (Pa. 1937). "[C]ourts are in no position to exercise control over schools and determine the policy of school administration; the judges ordinarily are not equipped for this immense task." See id. (holding that issues of day-to-day oversight of schools, such as the number of instructors hired, class sizes, how students are separated by grades in accordance with mental aptitudes are all questions which the school board alone should determine); see also, Regan v. Stoddard, 65 A.2d 240, 242 (Pa. 1949) (holding that the court is not properly in a position to determine methods of promoting or holding back students or what special classes should be provided to remedial students).

Trial courts have no business meddling in the field of day-to-day educational standards of pilot schools, such as what content appears in the pilot's logbook and at what point did the pilot

---

[6] Waugh, supra at 549; Glorvigen, supra at 552; Dallas Airmotive, supra at 700; Alsides v. Brown Inst., Ltd., 592 N.W.2d 468, 473 (Minn. App. 1999); Andre v. Pace U., 655 N.Y.S.2d 777, 779 (N.Y. App. Term. 1996).

immerse himself in the safety features of his own plane. Furthermore, flight/pilot education is by no means the wild west where content and standards of education vary greatly. Federal regulations clearly delineate standards for the certification and operation of Part 141 schools.[7] The court finds great similarity between the case at bar and the third-party educational malpractice cases out of Iowa, Moore v. Vanderloo, and the U.S. District Court of South Dakota, Sheesley v. The Cessna Aircraft Co.

In Moore, the plaintiff suffered a cerebral stroke after undergoing a chiropractic manipulation of her neck. As a result of the stroke, plaintiff sustained permanent bodily and emotional impairment. She filed against the chiropractor and Palmer College of Chiropractic which he had attended and graduated from four years earlier. The Iowa Supreme Court noted that in addition to graduating from chiropractic school, a chiropractor must pass a state regulated licensure examination to be licensed in the state of Iowa. The Moore court found that the licensure process added an additional layer of state oversight into the chiropractor's competency and thus negated an educational malpractice claim against the school that educated the subsequently licensed chiropractor. "[W]e refuse to interfere with legislatively defined standards of competency." Moore, supra at 115. In the realm of aviation where oversight over student flight instruction and standards for pilot certification is already set forth by the Federal Aviation Administration with Flight Standards District Offices in place to enforce these regulations, the injection of the non-pilot trial judge's oversight into the operation of Part 141 flight schools is grossly misplaced.

In Sheesley, after a fatal plane crash, the plaintiff sued a plane manufacturer, plane mechanic, and the flight school who trained the pilot regarding the specific aircraft. The

---

[7] 14 C.F.R. § 141.1 through 141.27 sets forth the requirements for a Part 141 school to be certified. 14 C.F.R. § 141.51 through 141.57 lays out the requirements for a Part 141 school's training course outline and curricula.

24

allegation against the flight school is that it did not properly teach the pilot regarding what to do in the event of an exhaust system failure. This is noteworthy, because like Sheesley, the Plaintiff here is attacking a distinct portion of the Defendants' instruction of PIC Durkin alleging that Defendants did not adequately instruct on the Cirrus Aircraft CAPS system. Addressing the differentiation between claims alleging a failure to educate on a specific topic versus claims attacking the quality of the educational process as a whole, the Sheesley court held that the public policy concerns are still the same.

> The gravamen of plaintiffs' claims are that FlightSafety negligently trained [the PIC] by failing to provide him the skills and training necessary to detect and safely land following an exhaust system failure. Specifically, plaintiffs allege that FlightSafety negligently created its curriculum by failing to include emergency procedures relating to an exhaust system failure. . . . In other words, plaintiffs are contesting the substance and manner of FlightSafety's training. Plaintiffs' claims 'encompass the traditional aspects of education,' and thus, sound in educational malpractice. . . .
>
> [T]he court finds that negligent failure to provide an overall education and negligent failure to train how to perform a specific procedure is a distinction without a difference. In both instances, the plaintiff is alleging that the school did not teach the student what he or she needed to know. . . .
>
> If the court here decides that FlightSafety should have taught a different curriculum, there is no principled basis to stop it from determining what curriculum should be taught at medical schools, paramedic schools, commercial truck driving schools, and innumerable other technical and higher education facilities.

Sheesley, supra at *16. In consideration of the rationale stated in Moore and Sheesley, the court echoes the sentiment "Schools, not courts, are in a better position to determine what should be taught." Id. Similarly, the federal government, not the courts, provides the educational oversight to a pilot's training and licensure.

## VI.    CONCLUSION

Educational malpractice claims against a school for failure to adequately educate a student are not permitted in Pennsylvania. Plaintiff seeks to distinguish her case from other educational malpractice cases because flying a plane is an inherently dangerous activity. The

25

public policy concerns as set forth in this opinion stand regardless of the subject matter or the dangerousness of the content taught. For the reasons set forth above, the Order dated December 18, 2020 should be affirmed.

BY THE COURT:

LEONARD G. BROWN III, JUDGE

Attest:

Copies to:

Darrell C. Dethlefs, Esq. *MAIL*
Laurie A. Salita, Esq. *ESERVED*

NOTICE OF ENTRY OF ORDER OR DECREE
PURSUANT TO PA. R.C.P. NO. 236
NOTIFICATION: THE ATTACHED DOCUMENT
HAS BEEN FILED IN THIS CASE
PROTHONOTARY OF LANCASTER CO., PA
DATE: 3-1-21